**Don W. SMITH and Benell Davis, Plaintiffs,**

v.

**The BOARD OF PUBLIC UTILITIES for the City of Kansas City, Kansas, Defendant.**

**Civ. A. No. 97–2352–KHV.**

United States District Court, D. Kansas.

Feb. 17, 1999.

George E. Mallon, George E. Mallon, P.A., Kansas City, KS, James E. Kunce, Overland Park, KS, for Plaintiffs.

Don W. Smith, Kansas City, KS, pro se.

Henry E. Couchman, Jr., Daniel B. Denk, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, Harold T. Walker, City of Kansas City, Kansas, Legal Dept., Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter is before the Court on the defendant's *Motion for Summary Judgment* (Doc. #31) filed June 23, 1998. Plaintiffs Don Smith and Benell Davis have filed a response to the motion and defendant, the Board of Public Utilities for the City of Kansas City, Kansas [BPU], has filed its reply. The matter is now ready for ruling. Having carefully considered the parties' arguments and the applicable law, the Court finds that defendant's motion should be sustained for the reasons set forth below.

### I. *Factual Background*

With respect to BPU's motion for summary judgment, the following material facts are found to be uncontroverted pursuant to Federal Rule of Civil Procedure 56 and D.Kan.Rule 56.1.[1]

### A. Claims of Don W. Smith

Don W. Smith has been employed by BPU since March 1976. He worked as a Meter Reader until April 1988, when he became an apprentice mechanic. He completed the apprenticeship program and received the position of Power Plant Mechanic A in June 1992.

Since becoming a Power Plant Mechanic A, Smith has been a member of the "roving group." Mechanics in the roving group are not permanently assigned to any power plant. Roving mechanics work at BPU power plants as needed, including during outages. Between outages, roving mechanics are assigned to different plants. In addition to performing mechanical maintenance at the power plants when needed, roving mechanics are responsible for performing mechanical maintenance at other BPU facilities.

*Appointment of Gaunce instead of Smith to Position of Supervisor of Mechanics at Nearman*

On June 19, 1996, BPU posted a Job Bid Bulletin Notice for Job Bid No. 2332, Supervisor of Mechanics—Nearman. The Supervisor of Mechanics at Nearman supervises and assigns work to mechanics and general maintenance personnel engaged in inspection, repair, and overhaul of all controls and mechanical equipment at the Nearman Power Station. Four employees applied for Job Bid No. 2332: Edward Gaunce (white male), Thomas McBratney (white male), Leland Pennington (white male), and Smith (African–American male).

---

1. Under D.Kan.Rule 56.1, "[a]ll material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." For purposes of summary judgment, each document must be authenticated by and attached to an affidavit which meets the requirements of Federal Rule of Civil Procedure 56(e). 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738 (1998) at 382–84. *See, e.g., Nolla Morell v. Riefkohl,* 651 F.Supp. 134, 140 (D.P.R.1986) (documents filed by defendants on motion for summary judgment inadmissible where unaccompanied by affidavits attesting to validity of documents); *Cummings v. Roberts,* 628 F.2d 1065, 1068 (8th Cir.1980) (on motion for summary judgment, district court properly did not consider 17 pages of medical records that were attached to affidavit but not certified as required by Federal Rule of Civil Procedure 56(e)). Further, the affiant should be the person through whom the exhibits could be admitted into evidence. *Nolla Morell,* 651 F.Supp. at 140. Smith has failed to comply with these specific requirements.

Don Lightfoot, the General Maintenance Supervisor at Nearman, was responsible for recommending a candidate to fill Job Bid No. 2332. Lightfoot claims that he recommended Gaunce for this position because Gaunce was the most qualified candidate. Gaunce had worked at BPU since September 1967 and had over 23 years of experience in power plant maintenance. Gaunce also had seven years of experience supervising and assigning work to mechanics and maintenance personnel at BPU power stations, first as Shift Maintenance Supervisor, the position Gaunce held from May 1989 to June 1991, and, beginning in June 1991, as Supervisor of Roving Crews. As Supervisor of Roving Crews, Gaunce supervised mechanics and maintenance personnel in the roving group. His duties were similar to those of the Supervisor of Mechanics—Nearman. Gaunce had worked at the Nearman plant during outages, supervising and assigning work to roving mechanics and maintenance personnel. As Supervisor of Roving Crews, Gaunce was Smith's immediate supervisor at all times at issue here.

The other three candidates for Job Bid No. 2332, McBratney, Pennington, and Smith, lacked Gaunce's supervisory experience. Smith's application contained no mention of supervisory experience. At the time of Job Bid No. 2332, Pennington and McBratney held positions as Power Plant Mechanic A. Each of the two had 18 years of experience in power plant maintenance. Smith had only eight years of power plant maintenance experience, which included four years in the apprenticeship program. On July 22, 1996, BPU awarded Job Bid No. 2332 to Gaunce.

BPU has adopted an Equal Employment and Affirmative Action Policy and Affirmative Action Plan, as mandated by Executive Order 11246. Prior to the award of Job Bid No. 2332, BPU's Equal Employment Opportunity/Affirmative Action Officer, Sharron Parker, reviewed the job bid packet to ensure that the selection decision complied with the Equal Employment and Affirmative Action Policy and Affirmative Action Plan.

Parker is an African–American female. BPU's policy is to award management positions on the basis of qualifications. This is true for management positions "targeted" under BPU's Affirmative Action Plan. Only if candidates' qualifications for a position are equal does BPU consider a candidate's race or gender. Parker concluded that Gaunce clearly was more qualified than Smith and that Gaunce's selection complied with BPU's Equal Employment and Affirmative Action Policy and Affirmative Action Plan.

### Appointment of Acting Supervisor of Mechanics at Nearman

On June 14, 1996, the Manager of BPU's Electric Supply Division, Larry Adair, recommended to BPU's Acting General Manager, Robert Sadrakula, that Gaunce, Supervisor of Roving Crews, be appointed Acting Supervisor of Mechanics at Nearman effective July 1, 1996. Adair made the recommendation for two reasons. First, Adair had decided to recommend that Gaunce's position as Supervisor of Roving Crews be eliminated as part of a reduction in staff. Second, the position of Supervisor of Mechanics at Nearman was vacant, and Adair needed someone to fill the position on an acting basis until a permanent appointment was made. According to Adair, Gaunce was the most qualified available person to fill the position on an acting basis. As Supervisor of Roving Crews, Gaunce performed duties similar to those of the Supervisor of Mechanics at Nearman, including supervising and assigning work to mechanics and maintenance personnel engaged in the inspection, repair, and overhaul of equipment at BPU power plants.

### Drug and Alcohol Testing

Don Woodson has held the position of Employment Officer at BPU since May 1994. As Employment Officer, Woodson is responsible for administering BPU's drug and alcohol testing policies. Effective January 1, 1996, BPU implemented a drug and alcohol testing policy for employees who were not previously covered by its

drug and alcohol testing policy for employees who operate commercial vehicles.

As part of this policy, employees in safety-sensitive positions were required to undergo drug and alcohol testing on a random basis. In 1996, random testing worked as follows: Woodson provided the testing laboratory, Clinical Reference Laboratory, the employee numbers of employees in safety sensitive positions. Prior to the first of each month, Clinical Reference Laboratory provided Woodson a randomly generated list of 45 employee numbers divided among four categories. Woodson also received a randomly generated list of 32 alternate employee numbers divided among the categories. When Woodson received the lists, he matched the employee numbers with the employee names, departments and divisions. On those days on which he was available to receive test results, Woodson selected employees from one or more of the four categories and notified their supervisors that the employees were to report to the collection site for drug or alcohol testing. After Woodson had selected the employees for testing, he notified the collection site of their names, their status, and the type of test the employees were to receive.

On any given day, Woodson attempted to select employees from several different departments, in an effort to spread the burden as much as possible and not affect service. Woodson was more successful at this on some days than on others. On January 16, 1996, Woodson scheduled nine employees, including Smith, from the randomly-generated list which Clinical Reference Laboratory provided for drug or alcohol tests.

Five of the employees scheduled for testing on January 16, 1996, happened to be African–American. Four were white. Eight of the nine employees scheduled for testing on January 16, 1996, were tested that day. The ninth employee, a white male in the Operations department, was tested the following day.

On November 22, 1996, Woodson mistakenly informed the collection site that three employees were scheduled for random drug tests when in fact they were scheduled for random alcohol tests. Woodson also mistakenly informed the employees' supervisors that the employees were scheduled for drug tests. Two of the affected employees were white and one, Smith, was African–American.

Smith came to Woodson's office and asked for a copy of the list which showed that he was scheduled for a drug test. Woodson handed him a copy of the list with the names of other employees blacked out. Smith pointed out to Woodson that he was scheduled for an alcohol, not a drug, test. Woodson agreed. Woodson then called the collection site and informed the site that the three employees were scheduled for alcohol, not drug, tests.

The collection site later called Woodson and told him that while Smith was listed for a drug test, he claimed he was scheduled for an alcohol test. Woodson again informed the site that Smith was scheduled for an alcohol test. On November 22, 1996, Smith received an alcohol test.

### The Conduct Memorandum

In mid-February 1997, BPU's Equal Employment Opportunity/Affirmative Action Officer, Sharron Parker, reported to the Director of Human Resources, Jim King, that Smith had made harassing comments to her while she was shopping at a local grocery. Previously, Parker had told King about other inappropriate conduct by Smith. King instructed Parker to document what had occurred.

On February 24, 1997, Parker provided King a memorandum concerning Smith's conduct. In the memorandum, Parker stated that on February 13, 1997, at approximately 5:56 p.m., while she was selecting meat at an area grocery, Smith approached her from the rear and whispered in her ear, "You're going down baby." Parker stated that as she turned around to see who had said this, Smith chuckled, grinned, repeated this statement, and walked away.

King asked the BPU Employee Relations Officer, Kevin Williams, to interview Smith about Parker's allegations. On February 27, 1997, Williams told King that Smith had denied meeting Parker at the grocery store. On March 4, 1997, King received a letter from Smith which responded to Parker's memorandum. In the letter, Smith stated that he could not recall seeing Parker at a grocery store on February 13, 1997. King, however, believed that Parker was telling the truth.

BPU's 1996 Personnel Code, which was in effect at the time material hereto, set forth rules of conduct and corresponding penalties for BPU employees. Rule No. 13 prohibited employees from:

Threatening, intimidating, harassing[,] coercing or interfering with another while on Utility premises or during working hours. The use of oral, written, recorded or symbolic words or other forms of communication or engaging in acts or conduct that would evidence or show an intent to intimidate, coerce, harass or discriminate against another person on the basis of sex, religion, race, national origin, physical disability or any other personal characteristic or attribute protected or guaranteed by Federal or State law from such acts or conduct.

Rule No. 13 specifies that the "[p]enalty [is] to be determined by circumstances."

According to King, although Smith's remark did not take place on Utility premises or during working hours, it was clearly directed at Parker's performance of her job duties. Given the circumstances, King believed that a Conduct Memorandum was warranted and that an appropriate penalty for Smith was a warning and 180 days probation.

On March 5, 1997, BPU issued a Conduct Memorandum which warned Smith and gave him 180 days probation. Smith did not suffer any reduction in pay or benefits or time off as a result of the Conduct Memorandum. The probationary period expired at the end of 180 days without further incident.

### Plant Assignments Subsequent to Filing of EEOC Charge

At the beginning of September 1997, the Supervisor of Common Plant Maintenance, Bill Schuck, assigned two mechanics in the roving group, Smith and Anthony Lopez, to the Kaw Power Station to assist in dismantling and inspecting the K–3 unit, which had gone off-line. Subsequently, BPU decided to close Kaw Power Station. Smith and Lopez stayed at Kaw to assist in closing the plant until on or about October 20, 1997, when BPU assigned them to the Quindaro plant.

On or about January 1, 1998, Schuck assigned four mechanics in the roving group, Park, Bailes, Lopez and Smith, to Kaw Station for approximately one week. From January 7 through January 11, 1998, all roving mechanics were assigned to Nearman. On or about January 12, 1998, Schuck assigned Smith and Bailes (a white mechanic) to Kaw Station to assist further in closing that plant.

Since on or about February 9, 1998, plaintiff Smith has been assigned to the Nearman Power Station. While assigned at Nearman, Smith has worked at several different locations, including Nearman Station, Kaw Station, 55th Street water pump station, and Muncie garage.

### August 8, 1997 Grievance

On August 5, 1997, the General Maintenance Supervisor at the Quindaro Power Station, Richard Montemayor, assigned Smith to work with Rodger Green and Ray Garbrandt as the third mechanic on the alignment of the motor to the No. 1 soot blowing air compressor. Garbrandt and Green, who are stationed at Quindaro, had been overhauling the compressor for several months.

On August 6, 1997, Montemayor assigned Smith to the compressor alignment. Montemayor assigned Garbrandt to repair the ash system after one of the mechanics on the project called in sick. On August 7, 1997, plaintiff Smith again was assigned to the compressor alignment and Garbrandt

to the ash system. Green requested that Garbrandt be returned to help with the final alignment of the compressor. On August 8, 1997, Montemayor reassigned Garbrandt to the compressor because of his familiarity with the project. Montemayor assigned Smith to finish the repair of the ash system.

That same morning, Smith told Montemayor that he objected to being moved off the compressor job and put on the ash system job. Smith later filed a grievance, claiming denial of craft-related experience. On August 14, 1997, Smith and Montemayor discussed the matter in Montemayor's office. During the meeting, Smith tore up the original of his grievance.

### September 2, 1997 Grievance

On the Friday before Labor Day weekend in 1997, Smith became aware that BPU had bypassed him for overtime work that weekend. Instead of bringing the oversight to management's attention, he clocked out and went home. On September 2, 1997, however, Smith filed a grievance which claimed that BPU did not ask him to work overtime from August 30 through September 1, 1997 and also sought overtime pay. As a result of his grievance, BPU paid Smith $1,131.64 in overtime pay.

### EEOC Charge and KHRC Complaint

On or about November 25, 1996, Smith filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). In the charge, Smith alleged that BPU had denied him a promotion to Mechanic Supervisor and selected him for drug testing because of his race. He also alleged retaliation.

On January 13, 1997, Smith filed a complaint with the Kansas Human Rights Commission (KHRC), making the same complaints. In neither charge of discrimination did Smith allege that BPU had discriminated against him with regard to job assignments, on the basis of race.

### B. Claims of Benell Davis

Benell Davis has been employed by BPU as a "plant helper" since August 1990. Plant helper is a general labor position. As plant helper, Davis worked with the power plant mechanics. Davis' responsibilities included getting tools and bringing them to the worksite and helping power plant mechanics perform their duties.

Venita Kyle has been BPU's Wage and Salary Administrator since 1986. Kyle is a black female. As Wage and Salary Administrator, Kyle's responsibilities include directing and coordinating the job bid process in accordance with the bid policy, collective bargaining agreements, Personnel Code, and Affirmative Action/Equal Employment Opportunity guidelines. Kyle is responsible for determining whether internal bidders for positions at BPU meet the minimum education and experience requirements or qualification guidelines as set forth in the Job Bid Bulletin Notice and Position Description.

On May 9, 1996, BPU posted a Job Bid Notice for Job Bid No. 2318, Power Plant Mechanic A—Quindaro. As stated in the Job Bid Notice, the qualification guidelines for Power Plant Mechanic A—Quindaro were:

> High School Diploma/GED, and completion of a recognized apprenticeship or have several years equivalent work experience in Central Power Stations or in heavy industry.

Four employees applied for Job Bid No. 2318: Norman Cruse (white male), Steve McClendon (white male), Michael Gamber (white male), and Davis (African–American male). Kyle determined that none of the applicants met the qualification guidelines because none of them had completed a recognized apprenticeship or had several years equivalent work experience in Central Power Stations or in heavy industry.

On August 13, 1996, BPU posted a Job Bid Notice for Job Bid No. 2360, Power Plant Mechanic A—Quindaro. The qualification guidelines for the position were the same as for Job Bid No. 2318.

Two employees applied for Job Bid No. 2360: Norman Cruse (white male) and Davis (African–American male). For the reasons stated above, Kyle determined that neither Cruse nor Davis met the qualification guidelines for the position. Davis had not received any certifications as a mechanic and had not taken any courses to qualify him as an "A" mechanic.

The duties and responsibilities of Power Plant Mechanic A were as follows:

1) Selects and maintains tools, materials, supplies, and equipment necessary to perform required maintenance.

2) Documents recognized work requirements according to plant maintenance procedures.

3) Inspects, performs preventive maintenance and repairs to steam turbines and related auxiliaries.

4) Inspects, performs preventive maintenance and repairs to steam boilers and related auxiliaries including clean-up.

5) Inspects, performs preventive maintenance and repairs to air compressors and related equipment including reciprocating and turbo compressors, intercoolers, piping and valves.

6) Inspects and repairs centrifugal and axial fans and associated dampers and lubricating oil systems.

7) Inspects, performs preventive maintenance and makes repairs to the coal conveying equipment including crushers, conveyors, flop gates, chutes, pulverizers, feeders, and other related equipment.

8) Inspects and repairs air and steam sootblower systems including piping and associated valves.

9) Inspects and repairs river intake equipment including cranes, traveling screens and circulating water pumps.

10) Inspects and repairs steam and water valves, traps and piping; repair the unit condensers, deaerators, and feedwater heaters.

11) Inspects and fits journal bearings including scraping and taking measurements to assure proper operation, re-places antifriction bearings; installs couplings, aligns shafts and couplings.

12) Inspects, performs preventive maintenance and repairs to motor driven boiler feed pumps and associated auxiliary systems.

13) Operates the house crane, cutting torches, and welding equipment for other than certified procedures.

14) Selects cables, ropes, and assembles rigging, work platforms, braces and supports as required to accomplish repairs.

15) Adjusts clearances and aligns moving parts using rules, calipers, micrometers, and other measuring instruments.

16) Removes and installs insulation and lagging relative to work assignment.

17) Performs similar and incidental and related job duties as assigned.

Of the duties and responsibilities of a Power Plant Mechanic A, Davis had performed only items numbered 11, 14, and 15 in his previous employment. Davis had never repaired boiler feed pumps, steam and water valves, traps in piping, or unit condensers, deaerators, or feed water heaters. Davis had observed power plant mechanics perform the above duties and responsibilities, but never had done the work himself.

BPU's position has been that persons in Plant Helper or other maintenance positions, such as Certified Welder, cannot qualify for Power Plant Mechanic A positions based on their experience in assisting or working with power plant mechanics; instead, they must either complete a recognized apprenticeship or have several years equivalent work experience in central power stations or in heavy industry.

On or about August 4, 1988, Eldon May, who held the position of Certified Welder, filed a grievance after BPU denied him a Power Plant Mechanic A position at Nearman. May is a white male. BPU determined that May did not meet the minimum qualifications for Power Plant Mechanic A. Although May had worked with mechanics for many years in his capacity as a Certi-

fied Welder, he had not completed a recognized apprenticeship and did not have several years equivalent work experience in central power stations or in heavy industry, as required for the position.

In a letter to the union's business manager, dated September 15, 1988, the Acting Director of Human Resources, Jesse Rodriguez, denied May's third step grievance, stating as follows:

> The management has given full attention to the Union's request that the grievant's qualifications and experience be considered in determining whether he is eligible for the Power House Mechanic positions. Although Mr. May's qualifications and experience are exemplary and his performance has been above reproach, the management cannot in good conscience dilute the requirements of the Power House Mechanic classification. It is therefore the management's opinion that if Mr. May wishes to pursue a position with the Mechanics group he should do so through the Power House Mechanic Apprentice Program.

From March 1987 to January 1994, Shirley Lewis held the position of Supervisor of Human Resources Development at BPU. Lewis is an African–American female. As Supervisor of Human Resources Development, Lewis directed all employment and internal promotion activities at BPU, including the internal employment process. She also was responsible for the development, implementation, and monitoring of BPU's Affirmative Action Plan. In addition, Lewis supervised the Wage and Salary Specialist and Employment Coordinator.

On February 18, 1992, BPU posted a Job Bid Notice for Job Bid No. 1750, Power Plant Mechanic A—Quindaro. The Job Bid Notice sets forth the following qualification guidelines for the position:

> High school diploma/GED, and completion of a recognized apprenticeship or have several years equivalent work experience in central power stations or in heavy industry.

> Incumbent must be able to interpret engineering drawings, working drawings, and maintenance manuals used in the analysis, repair, and testing of malfunctioning mechanical equipment and systems. Must be able to work overtime, holidays, regular days off, and other schedules as needed. Must have a good attendance and safety record.

> Incumbent must be skilled in use of tools, materials, equipment necessary to perform maintenance.

Ray Garbrandt, who held the position of Plant Helper A, applied for Job Bid No. 1750. Garbrandt had completed a plumbing apprenticeship, including pipefitter training, and he was a licensed Master Plumber. Lewis determined that Garbrandt met the qualification guidelines for Power Plant Mechanic A. In addition, Lewis was able to verify with Garbrandt's former employers that he had a number of years of equivalent work experience in heavy industry.

In the early 1980s, the separate positions of machinist, pipefitter, and boilermaker were combined into the position of power plant mechanic. An apprenticeship as a pipefitter or plumber is considered a "recognized apprenticeship" within the meaning of the qualification guidelines for Power Plant Mechanic A.

In 1990, BPU had hired Paul Munoz, a Hispanic male, as a Power Plant Mechanic C. Munoz, like Garbrandt, had completed a plumbing apprenticeship.

Lewis forwarded an Interview Guide for Garbrandt to Richard Montemayor, General Maintenance Supervisor at the Quindaro plant. Montemayor determined that Garbrandt did not have enough related experience for the position of Power Plant Mechanic A and that Garbrandt would need more mechanical skills. Subsequently, Garbrandt completed machine shop and arc welding courses at the Area Vocational Technical School.

On October 13, 1993, BPU posted a Job Bid Notice for Job Bid No.2008, Power

Plant Mechanic A—Kaw. The qualification guidelines for Job Bid No.2008 were the same as for Job Bid No. 1750.

Garbrandt applied for Job Bid No.2008. Because Garbrandt met the qualification guidelines for Job Bid No.2008 and had obtained additional training, Lewis forwarded an Interview Guide for him to the General Maintenance Supervisor at Kaw, Donald Jaster.

Subsequently, Jaster interviewed Garbrandt and recommended him for the position. Jaster determined that Garbrandt met the qualifications standards for Power Plant Mechanic A. Garbrandt had completed a four-year apprenticeship and had a Master Plumber license. As part of Garbrandt's apprenticeship, he had received pipefitter training. In addition, Garbrandt had ten years experience prior to his employment with BPU in heavy industry, installing and repairing pumps, seals, valves, and packing and replacing brushes. During Garbrandt's interview, he was able to correctly answer technical questions that were asked regarding the duties and responsibilities listed on the job description. In addition, Garbrandt successfully completed the mechanic skills demonstration test. Garbrandt recognized and demonstrated the use of hand tools and equipment common to Power Plant Mechanics. Garbrandt used micrometers and calipers on several pieces of equipment and obtained proper measurements. He was able to read and interpret blue prints. Garbrandt took and passed the welding test. He further demonstrated the ability to correctly align pieces of equipment. On November 29, 1993, BPU awarded Garbrandt Job Bid No.2008.

## II. *Summary Judgment Standards*

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it

is so one-sided that one party must prevail as a matter of law." *Anderson* at 251–52, 106 S.Ct. 2505.

### III. *Analysis.*

#### A. Smith's Race Discrimination Claims

##### 1. *Smith's claim of race discrimination in job assignments*

In the Pretrial Order, Smith claims that BPU discriminated against him on the basis of race in job assignments. Specifically, Smith claims that since 1992, BPU has not assigned him to the Water Department as much as similarly situated, nonminority roving mechanics; that he has been the only African–American mechanic at Quindaro during that time period; that BPU has assigned him only incidental clean-up, button-up, physical, and non-technical jobs, while less senior, similarly situated non-minority employees have received craft- and trade-related jobs with premium experience; that BPU has assigned 90 percent of Smith's time to the least preferred plant (Quindaro); and that BPU continually has assigned him with more senior employees, so that others get more job experience and credit for the work. *Pretrial Order* (Doc. # 42) entered July 30, 1998 at 3–4.

BPU contends that it is entitled to summary judgment on such job assignment claims because Smith did not raise them in his charges of discrimination with the EEOC and the KHRC, and he therefore failed to exhaust his administrative remedies. In Smith's EEOC charge and KHRC complaint, Smith claimed that BPU had discriminated against him on the basis of race in two discrete ways: (1) BPU had denied him promotion to the position of Supervisor of Mechanics at the Nearman plant; and (2) BPU had subjected him to drug testing.

■ "A plaintiff must exhaust his administrative remedies before bringing suit under Title VII and the Kansas Act Against Discrimination." *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1409 (10th Cir.1997) (citing *Jones v. Runyon*, 91 F.3d 1398, 1399–1401 (10th Cir.1996), *cert. de-*

*nied*, 520 U.S. 1115, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997); *Van Scoyk v. St. Mary's Assumption Parochial Sch.*, 224 Kan. 304, 580 P.2d 1315, 1317–18 (1978)). The exhaustion requirement serves two purposes: to give notice of the alleged violation to the charged party, and to give the EEOC an opportunity to conciliate the claim, which effectuates Title VII's goal of securing voluntary compliance. *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir. 1994) (citations omitted). " 'Allowing a complaint to encompass allegations outside the ambit of the predicate charge would circumvent the administrative agency's investigatory and conciliatory role as well as deprive the charged party [of] notice of the charge.' " *Harrell v. Spangler, Inc.*, 957 F.Supp. 1215, 1219 (D.Kan.1997) (quoting *Jensen v. Board of County Comm'rs*, 636 F.Supp. 293, 298 (D.Kan.1986)).

■ To be included in a lawsuit under Title VII or the KAAD, plaintiff's allegations must be "reasonably related" to the allegations listed in the administrative charge. *Aramburu*, 112 F.3d at 1409 (citing *Brown v. Hartshorne Public School Dist. No. 1*, 864 F.2d 680, 682 (10th Cir. 1988)). "[C]onsideration of complaints not expressly included in an EEOC charge is appropriate where the conduct alleged would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made." *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1416 n. 7 (10th Cir.1993).

■ The Court finds that Smith's allegations concerning discriminatory job assignments are not reasonably related to the allegations made in his administrative charges of discrimination. In investigating the charge of discrimination, neither the EEOC nor the KHRC would have had reason to inquire into his day-to-day job assignments. *See Aramburu*, 112 F.3d at 1409–1412 (claims that employer subjected employee to hostile work environment on account of ancestry and disability and denied transfer held not reasonably related to wrongful discharge claim); *Reese v.*

*Goodyear Tire & Rubber Co.*, 859 F.Supp. 1381, 1387 (D.Kan.1994) (racial harassment claim not reasonably related to administrative charge alleging wrongful discharge and post-discharge retaliation). Accordingly, the Court finds that BPU's motion for summary judgment on Smith's claim of discrimination in job assignments is sustained.[2]

### 2. *Smith's race discrimination claim through failure to promote*

Smith claims that because of his race, BPU failed to promote him to the position of Supervisor of Mechanics at Nearman. *Pretrial Order* (Doc. # 42) at 4–5. For purposes of this motion, BPU assumes that Smith has stated a prima facie case of discriminatory failure to promote. Under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), after the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the promotion decision. *Simms v. Oklahoma*, 165 F.3d 1321, 1327 (10th Cir.1999) (citing *Reynolds v. School Dist. No. 1*, 69 F.3d 1523, 1534 (10th Cir.1995)).[3]

■ The Court finds that BPU has articulated a legitimate, nondiscriminatory reason for its decision to promote Gaunce instead of Smith: BPU states that it chose Gaunce because he was the most qualified candidate for the job. The following facts are uncontroverted: Gaunce had worked at the utility since September 1967 and had over 23 years of experience in power plant maintenance. Gaunce had seven years of experience supervising and assigning work to mechanics and maintenance personnel at BPU power stations, first as Shift Maintenance Supervisor, the position which he held from May 1989 to June 1991, and beginning in June 1991, as Supervisor of Roving Crews. As Supervisor of Roving Crews, Gaunce supervised mechanics and maintenance personnel in the roving group. His duties were similar to those of the Supervisor of Mechanics at Nearman. As Supervisor of Roving Crews, Gaunce was Smith's immediate supervisor. Smith and the other candidates lacked Gaunce's supervisory experience. The application submitted by Smith contains no mention of supervisory experience.[4]

Once defendant has met its burden to articulate a legitimate, nondiscriminatory reason for a promotion decision, plaintiff bears the burden of showing that defendant's proffered reason was a pretext for discrimination. *Simms*, 165 F.3d at 1327; *see Randle v. City of Aurora*, 69 F.3d 441, 451–53 (10th Cir.1995). Smith has failed to produce evidence from which a jury reasonably could infer that BPU's stated reason for selecting Gaunce was a pretext for discrimination. Absent any genuine issue of material fact, BPU's motion for summary judgment on this claim must be sustained.

Smith next alleges that by appointing Gaunce to the position of Acting Supervisor of Mechanics at Nearman, BPU gave him an unfair advantage in the ultimate selection process and denied Smith the training which he needed for advancement and promotion. *Pretrial Order* at 4.

■ The uncontroverted facts reflect that Gaunce was appointed Acting Supervisor effective July 1, 1996—after Job Bid No. 2332 had been posted. Three weeks

---

**2.** "The general rule in the Tenth Circuit appears to be that exhaustion of administrative remedies is jurisdictional." *Schroder v. Runyon*, 1 F.Supp.2d 1272, 1279 (D.Kan.1998).

**3.** The same analysis applies to plaintiff's race discrimination claims under the KAAD. *Aramburu*, 112 F.3d at 1403 n. 3; *Randolph v. Board of Public Utilities*, 983 F.Supp. 1008, 1013 n. 7 (D.Kan.1997).

**4.** Contrary to Smith's contention, BPU was not precluded from considering the supervisory experience of the job applicants. The Job Bid Bulletin for Job Bid No. 2332 sets forth only *minimum* educational/experience requirements. Smith concedes that he lacked Gaunce's supervisory experience.

later, Gaunce received the permanent position. Before his appointment as Acting Supervisor, Gaunce had seven years of experience supervising mechanics and maintenance personnel. Adair, the Manager of Electric Supply, had decided to recommend the elimination of Gaunce's position as part of a reduction in staff. The position of Supervisor of Mechanics at Nearman was vacant, and Adair needed someone to fill the position on an acting basis until a permanent appointment was made. According to the uncontroverted facts, Gaunce was the most qualified available person to fill the position on an acting basis. BPU has met its burden of showing that it appointed Gaunce for legitimate, nondiscriminatory reasons.

Smith has produced no evidence that BPU's stated reasons for appointing Gaunce, i.e. that his position was being eliminated and that he was the most qualified candidate for the job, were pretexts for discrimination. Because Smith has failed to produce evidence that would create a genuine issue of material fact, BPU is entitled to summary judgment on this issue.

3. *Smith's claim that BPU discriminated against him by not abiding by its affirmative action plans and goals*

Smith alleges that BPU did not abide by its affirmative action plan and goals when it awarded Gaunce, rather than him, the Supervisor of Mechanics position at Nearman. Smith claims that BPU's failure to do so constitutes discrimination on the basis of race under Title VII. *Pretrial Order* at 5.

BPU contends that Smith has failed to state a claim for which relief can be granted. Thus BPU is in essence seeking to dismiss this claim for failure to state a claim under Fed.R.Civ.P. 12(b)(6). In ruling on a motion to dismiss, the Court must assume as true all well-pleaded facts in plaintiff's complaint and view them in a light most favorable to plaintiff. *See Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Swan-*

*son v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984). In this case, because the pretrial order has been entered, the court will assume as true all well-pleaded facts set forth by plaintiff in the pretrial order. *See Hullman v. Board of Trustees of Pratt Community College,* 950 F.2d 665, 667 (10th Cir.1991) (pretrial order supersedes all pleadings and controls the subsequent course of the case). The Court must make all reasonable inferences in favor of plaintiff, and the pleadings must be liberally construed. *See Swanson,* 750 F.2d at 813; Fed.R.Civ.P. 8(a); *Lafoy v. HMO Colorado,* 988 F.2d 97, 98 (10th Cir.1993). The issue in reviewing the sufficiency of plaintiff's complaint is not whether plaintiff will prevail, but whether plaintiff is entitled to offer evidence to support his claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court may not dismiss a cause of action for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his theory of recovery that would entitle plaintiff to relief. *See Conley v. Gibson,* 355 U.S. 41, 5–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence,* 927 F.2d 1111, 1115 (10th Cir.1991). Although plaintiff need not precisely state each element of his claims, he must plead minimal factual allegations on those material elements that must be proved. *See Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991).

The Court finds as a matter of law that Smith's allegations do not create a cause of action. BPU has adopted an Equal Employment and Affirmative Action Policy and Affirmative Action Plan, as mandated by Executive Order 11246. The executive order, however, does not provide a private right of action. *Suazo v. Regents of Univ.,* 149 F.3d 1191 (Table), 1998 WL 339714, *2 (10th Cir.1998). Smith has cited no case law that would support a Title VII action against the BPU for failure to adhere to its affirmative action plan in selecting the Supervisor of Mechanics at Nearman. Absent a showing of discrimination, Title VII recognizes no cause of

action for failing to implement or utilize an affirmative action program. *Ferguson v. Veterans Admin.*, 723 F.2d 871, 872 (11th Cir.), *cert. denied sub nom. Ferguson v. Walters*, 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984); *see Liao v. Tennessee Valley Authority*, 867 F.2d 1366 (11th Cir. 1989), *cert. denied sub nom. Liao v. Dean*, 494 U.S. 1078, 110 S.Ct. 1806, 108 L.Ed.2d 937 (1990). Moreover, even assuming that Smith has stated a claim under Title VII, the Court finds that BPU did not violate its affirmative action plan by awarding the Supervisor of Mechanics position to Gaunce, who was admittedly the most qualified candidate.

### 4. *Smith's claim that he was subjected to alcohol testing because of his race*

■ Smith asserts that BPU subjected him to alcohol testing on January 16 and November 22, 1996 because of his race. *Pretrial Order* at 5–6. The only basis for Smith's complaint about the test on January 16 is that January 16, 1996, was the day after Martin Luther King Jr. day, and five African–American employees were tested that day. Three white employees were also tested that day, however, and another was scheduled for testing. Based on this evidence, no reasonable jury could find that BPU singled out Smith for testing because of his race.[5]

■ Smith also complains that because of his race, Woodson scheduled him for a drug test when he should have been scheduled for an alcohol test on November 22, 1996. The undisputed evidence, however, is that Woodson made the same mistake with regard to two white employees. Moreover, when Woodson learned of the mistake, he immediately notified the testing site. Smith received an alcohol test as scheduled. Based on the evidence presented, the Court determines that no reasonable jury could find that the November 22, 1996 mix-up had anything to do with Smith's race. Accordingly, because Smith has failed to raise a genuine issue of material fact, the BPU is entitled to summary judgment on Smith's claim that it subjected him to drug or alcohol testing because of his race.

### B. Smith's Retaliation Claims

Smith claims that BPU retaliated against him for alleging unequal and discriminatory treatment of himself and other minority employees. Specifically, he alleges that BPU retaliated against him by subjecting him to drug testing in November 1996; placing him on probation in March 1997; denying him overtime and forcing him to file a grievance in September 1997; denying him opportunities for training by assigning him to the Kaw plant, which is being phased out; failing to make him lead mechanic; and forcing him to file a grievance over a work assignment in August 1997. *Pretrial Order* at 6–7.

The burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to retaliation claims. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985–86 (10th Cir.1996) (citing *Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 385 (10th Cir.1984)). To establish a prima facie case of retaliation, Smith must show that (1) he engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) he suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation; and (3) a causal connection exists between the protected activity and the adverse employment action. *See Berry*, 74 F.3d at 985 (citing *Burrus v. United Tel. Co.*, 683 F.2d 339, 343 (10th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982)); *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1381

5. Smith filed an internal EEO complaint, alleging that the testing was racially discriminatory. Smith later withdrew his complaint. In his deposition, he testified that Parker had convinced him to withdraw the complaint. He described his conversation with Ms. Parker as "warm." Smith told Parker that he would pursue the complaint at a later date "because not enough information was there at that time that would suggest it was ... intentional." (Smith depo., p. 90, ll. 8–25, p. 91, ll. 1–13)

(10th Cir.1994). Once plaintiff establishes a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Berry,* 74 F.3d at 986 (citing *Burrus,* 683 F.2d at 343).

■■■ To be considered "adverse," an alleged retaliatory act must have "affected the terms and conditions of employment." *Fortner v. State of Kansas,* 934 F.Supp. 1252, 1266–67 (D.Kan.1996), *aff'd,* 122 F.3d 40 (10th Cir.1997). " '[T]here are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions . . . of Title VII.' " *Id.* (quoting *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981)). In recognition of the remedial nature of Title VII, the law in the Tenth Circuit liberally defines "adverse employment action." *Jeffries v. State of Kansas Dept. of Social and Rehabilitation Services,* 147 F.3d 1220, 1232 (10th Cir.1998). Courts in the Tenth Circuit take "a case-by-case approach to determining whether a given employment action is 'adverse.' " *Id.* at 1232.

BPU does not deny that Smith engaged in protected opposition to Title VII discrimination. Rather, it contends that Smith has failed to produce sufficient evidence to establish the second and third elements of a prima facie case of retaliation under Title VII or the KAAD, *i.e.* adverse employment action and a causal connection between the protected activity and the adverse employment action. Specifically, the BPU argues that the adverse employment actions of which Smith complains were neither material nor causally connected to his protected activities. Additionally, BPU argues that it acted for legitimate nondiscriminatory reasons, and that Smith has failed to produce evidence to the contrary.

6. Smith has failed to explain how a delay of two days in taking the test affected the terms and conditions of his employment.

1. *Smith's claim that BPU retaliated against him by subjecting him to drug testing in November 1996*

On November 22, 1996, BPU told Smith to report for a random drug test when he was scheduled for a random alcohol test. Smith called the mistake to Woodson's attention and Woodson acted promptly to correct it. Smith received an alcohol test as scheduled.

■■■ The Court finds that Smith has failed to establish a prima facie case that BPU scheduled him for drug or alcohol testing on November 22, 1996, in retaliation for protected activity. Smith has presented no evidence from which a reasonable jury could find that he suffered any adverse consequences as a result of the alcohol test or Woodson's mistake.[6] Nor has Smith presented evidence of a causal connection between the test (or Woodson's mistake) and his protected activity.[7] Smith does not deny that his employee number appeared on a list for the month of November and that the testing laboratory randomly generated the list. Two other employees were mistakenly scheduled for drug tests on the same day as Smith. Moreover, the Court finds that BPU has met its burden of articulating a legitimate nonretaliatory reason for testing Smith: his name appeared on the November list. Smith has failed to produce any evidence that BPU's articulated reason was a pretext for retaliation.

2. *Smith's claim that BPU retaliated against him by placing him on probation in March 1997*

On March 5, 1997, in response to a complaint by BPU's Equal Employment Opportunity/Affirmative Action Officer that Smith had made inappropriate comments, BPU gave Smith a Conduct Memorandum. As a result, Smith received a warning and 180 days on probation.

7. In particular, Smith has offered no evidence that he should have been sent for testing on November 20, 1996 or that BPU knew of his upcoming meeting with the EEOC.

■■■■■ BPU has stated a legitimate nondiscriminatory reason for the Conduct Memorandum: Parker's complaints about Smith's inappropriate conduct, especially his remarks at the grocery store. Further, the Court finds that Smith has failed to produce evidence that BPU's stated reason for the Conduct Memorandum was a pretext for retaliation. According to the uncontroverted facts, King believed that Parker was telling the truth about Smith's remarks at the grocery store; he believed that the comments were directed at Parker's performance of her job duties and that under the circumstances, the Conduct Memorandum was warranted. The record contains no evidence that King acted with a retaliatory motive. Based upon the foregoing, the Court concludes that BPU is entitled to summary judgment on this claim.[8]

3. *Smith's claim that BPU retaliated against him by denying him overtime work*

During the 1997 Labor Day weekend, BPU bypassed Smith for overtime work. Before the start of the weekend, Smith knew that he had been bypassed, but he said nothing. When he returned to work the following week, he filed a grievance.

As a result of the grievance, BPU paid Smith $1,131.64 in overtime pay. Smith claims that BPU's action in bypassing him for overtime work was retaliatory.

■■■■■ BPU maintains that Smith has not produced evidence sufficient to establish the second and third elements of his prima facie case. The Court agrees. Bypassing Smith for overtime was not an adverse employment action because BPU fully compensated Smith for the oversight. Additionally, Smith has not shown a causal connection between the filing of his EEOC charge in November 1996 and the bypass nine months later. *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997) (four month time lag between protected activity and adverse action by itself insufficient to justify inference of causation). Smith has not controverted any of the facts supporting BPU's motion for summary judgment on this claim and he has not responded to BPU's arguments. The Court finds that summary judgment should be granted in favor of BPU on this claim.

4. *Smith's claim that BPU retaliated against him by assigning him to Kaw Station*

Smith alleges that he "has been assigned since fall of 1997 to a dead plant (Kaw

8. Even if the Court were to find that BPU had not stated a legitimate nondiscriminatory reason, it would nevertheless grant summary judgment on this claim because Smith has not produced evidence sufficient to establish the second and third elements of his prima facie case. Based upon the uncontroverted facts, the Court finds that the Conduct Memorandum was not an adverse employment action that affected the terms and conditions of Smith's employment. Smith admits that he did not suffer any reduction in pay or benefits as a result of the Conduct Memorandum, and that the 180–day probation period expired without incident.

Moreover, Smith has not shown a causal connection between his protected activity and the issuance of the Conduct Memorandum. In his deposition, Smith testified that BPU's Employee Relations Officer, Kevin Williams, questioned him about Parker's allegations on February 27, 1997, the same day Smith was to meet with an EEOC representative.

(Smith depo., p. 96, ll. 17–25, p. 97, ll. 1–16) Williams reported the results of his interview with Smith to the Director of Human Resources, Jim King, later that day. BPU did not issue the Conduct Memorandum until March 5, 1997. While the chain of events may be closely related in time, the undisputed evidence dispels any reasonable inference of a causal relationship between plaintiff's protected activity and the adverse action. Specifically, it is uncontroverted that Parker initially complained to King about Smith's conduct in mid-February, 1997. Smith has not shown that Parker knew of Smith's future EEOC meeting when she complained to King. Further, it is uncontroverted that when Williams met with Smith on February 27, 1997, he was simply following through on King's request that he interview Smith about Parker's allegations. Smith has presented no evidence that Williams or King knew of a planned meeting between Smith and the EEOC.

Plant which is being phased out) since filing his EEOC charges." *Pretrial Order* at 7. The uncontroverted facts, however, reflect that BPU assigned Smith not only to Kaw but also to Quindaro and Nearman. Since February 9, 1998, Smith has been assigned to Nearman. While assigned to Nearman, Smith has worked at several different locations, including Nearman, Kaw, the 55th Street water pump station, and Muncie garage.

■■■■■ BPU asserts, and the Court finds, that Smith's assignment to Kaw was not an adverse employment action. It is undisputed that as a member of the roving group, Smith is subject to assignment to different plants between outages. It is also undisputed that Smith was not the only mechanic assigned to work at Kaw; other mechanics were also assigned to work there. Moreover, Smith has failed to show a causal connection between his assignment to Kaw and his protected activity. Smith filed his EEOC complaint on or about November 25, 1996. BPU assigned Smith to Kaw in September 1997—nine months later. Such a lapse of time is too long to justify an inference of causation. *Conner*, 121 F.3d at 1395. Moreover, based upon the uncontroverted evidence, the Court finds that BPU assigned Smith and other mechanics to Kaw for legitimate nondiscriminatory reasons: their assistance was needed to dismantle and inspect the K–3 unit (which had gone off-line) and to close the plant. Smith has presented no evidence from which a reasonable jury could conclude that BPU's articulated reason was a pretext for retaliation. Accordingly, BPU is entitled to summary judgment on this claim.

5. *Smith's claim that BPU retaliated against him by not making him lead mechanic*

■■■ Smith alleges that BPU retaliated against him "by not making him the lead mechanic." *Pretrial Order* at 6. In his deposition, Smith testified that BPU's practice was for senior mechanics to do the work. Smith testified that he "very rarely" worked with a person with less seniori-

ty. (Smith depo., p. 124, ll. 15–25, p. 125, ll. 1–25, p. 126, ll. 13) In the Pretrial Order, Smith alleges that *"[f]or the past five years* plaintiff has continually been assigned with more senior employees, even though there are several less senior employees. This results in others getting credit for the work and more experience which are the basis for future promotions and advancements." *Pretrial Order* at 4 (emphasis added). By Smith's own account, the practice of assigning him to work with more senior mechanics—that is, failing to make Smith the lead mechanic—preceded the filing of his charge of discrimination in November 1996. Thus Smith has failed to show a causal connection between the filing of his charge of discrimination and BPU's failure to make him lead mechanic. Because Smith has failed to produce evidence to support the third element of a prima facie case, BPU is entitled to summary judgment on this claim.

6. *Smith's claim that BPU retaliated against him by forcing him to file a grievance over a work assignment in August of 1997*

Smith claims that BPU retaliated against him on August 8, 1997, when it assigned Garbrandt the No. 1 soot blowing air compressor job and reassigned him to a job repairing the ash system. Smith does not dispute that he tore up a grievance he had filed over the incident.

■■■ Smith fails to establish that the August 8, 1997 work assignment was an adverse employment action. Nor has Smith established that the reassignment was causally related to the filing of his EEOC charge eight months earlier. *Conner*, 121 F.3d at 1395. Furthermore, BPU has presented a legitimate nondiscriminatory reason for assigning Garbrandt to the compressor job. According to the uncontroverted facts, for several months, Garbrandt had been working with another mechanic, overhauling the compressor. Green, the other mechanic, asked that Garbrandt be returned to help with the final alignment of the compressor. Monte-

mayer, the General Maintenance Supervisor at Quindaro, reassigned Garbrandt to the compressor because of his familiarity with the project. Once again, Smith has presented no evidence from which a reasonable jury could conclude that BPU's articulated reason was actually a pretext for retaliation.

For the above reasons, the Court finds that BPU is entitled to summary judgment on Smith's Title VII and KAAD retaliation claims.

## C. Davis' Race Discrimination Claims

Davis claims that BPU twice denied him promotion to the position of Power Plant Mechanic A (Job Bid Nos. 2318 and 2360) because of his race. *Pretrial Order* at 8. BPU maintains that Davis has failed to establish a prima facie case of discriminatory failure to promote.

To carry the initial burden of establishing a prima facie case of race discrimination for a failure to promote claim, Davis must show that (1) he belongs to a minority group; (2) he was qualified for the promotion; (3) he was not promoted; and (4) the position remained open or was filled with a non-minority. *Simms v. Oklahoma*, 165 F.3d 1321, 1327 (10th Cir. 1999) (citing *Reynolds v. School Dist. No. 1*, 69 F.3d 1523, 1534 (10th Cir.1995)).

■ BPU contends, and the Court finds, that Davis has failed to establish the second element of his prima facie case: that he was qualified for the positions. Davis does not dispute that the qualification guidelines require completion of a recognized apprenticeship or several years equivalent work experience in central power stations or in heavy industry. Davis admits that he has not completed a recognized apprenticeship. BPU's Wage and Salary Specialist, Venita Kyle, who is African–American, determined that Davis did not have several years of equivalent work experience in central power stations or in

heavy industry. In his deposition, Davis admitted that he had previous experience performing only three of the 17 duties and responsibilities of an "A" mechanic. Davis concedes that his experience does not qualify him for the position of Power Plant Mechanic A. Because Davis has failed to come forward with evidence to establish an essential element of his prima facie case, BPU is entitled to summary judgment on his race discrimination claims.

■ Further, the Court finds that BPU has articulated a legitimate nondiscriminatory reason for its decision not to promote Davis to the position of Power Plant Mechanic A. Specifically, BPU determined that Davis did not meet the qualification guidelines for the position. The uncontroverted facts establish that the Wage and Salary Specialist, Venita Kyle, determined that all the applicants, minority and nonminority, failed to meet the qualifications guidelines. Thus, Davis was not singled out on the basis of race. Davis does not dispute that BPU had previously denied a grievance by Eldon May, who is white, after May had been rejected for the position of Power Plant Mechanic A at Nearman. As a Certified Welder, May had worked with power plant mechanics for many years. In his letter denying May's grievance, the Acting Director of Human Resources, Jesse Rodriguez, recognized May's exemplary qualifications and experience, but took the position that "management cannot in good conscience dilute the requirements of the Power House Mechanic classification." The Supervisor of Human Resources Development, Shirley Lewis, who is African–American, determined that Ray Garbrandt met the qualification guidelines for Power Plant Mechanic A. Unlike Davis, Garbrandt had completed a recognized apprenticeship as a plumber. In addition, he had ten years work experience in heavy industry.[9] Davis has failed to meet his

9. Davis also alleges that by not considering him for Job Bid Nos. 2318 and 2360, BPU failed to abide by its affirmative action plan. As discussed above, *supra* p. 1289, this allega-

tion fails to state a claim upon which relief may be granted. Moreover, Davis has not shown that BPU's affirmative action plan required the promotion of a candidate who did

burden of producing evidence from which a jury reasonably could conclude that BPU's stated reason was in fact pretext for race discrimination. Based upon the foregoing, the BPU's motion for summary judgment on this claim is sustained.

**IT IS THEREFORE ORDERED** that *The Board of Public Utilities for the City of Kansas City, Kansas' Motion for Summary Judgment* (Doc. # 31) filed June 23, 1998, be and hereby is **SUSTAINED.**

not meet the minimum qualifications for the position.