Larry F. BUDENZ, Plaintiff,

v.

SPRINT SPECTRUM, L.P., a Foreign
Limited Partnership d/b/a Sprint
PCS, Defendant.

No. 01–2355–JAR.

United States District Court,
D. Kansas.

Oct. 25, 2002.

Donald E. Bucher, Gould, Thompson & Bucher, P.C., Kansas City, MO, for Plaintiff.

Karen R. Glickstein, Robert A. Henderson, Monica M. Fanning, Shughart Thomson & Kilroy, PC, Kansas City, MO, for Defendant.

### MEMORANDUM AND ORDER PARTIALLY GRANTING SUMMARY JUDGMENT

ROBINSON, District Judge.

Plaintiff Larry Budenz brought this action pursuant to Title VII of the Civil Rights Act of 1964, as amended,[1] and the Kansas Act Against Discrimination (KAAD),[2] alleging quid pro quo same sex harassment and retaliation. This matter is before the Court on Defendant Sprint Spectrum, L.P.'s Motion for Summary Judgment (Doc. 26).

### UNCONTROVERTED FACTS

The following facts are either uncontroverted or, if controverted, construed in the light most favorable to Plaintiff as the non-moving party.

Plaintiff was hired as a Program Manager in the Vendor and Contract Management Group at Sprint by Jim Fletcher on January 29, 1999 to assist Fletcher with the management of the Lucent contract. Plaintiff initially reported to Fletcher. In May or June of 1999 Fletcher left the group and Plaintiff began reporting to Roger McNeill. McNeill and Plaintiff were the only two individuals who made up

---

1. 42 U.S.C. § 2000e, *et seq.*

2. K.S.A. 44–1001, *et seq.*

the Lucent Team and Plaintiff was the only individual McNeill supervised. Both Fletcher and McNeill reported to Jim Ramsey.

Plaintiff complains of sexual harassment in the form of inappropriate verbal and physical conduct by McNeill. Plaintiff's primary complaint is that McNeill repeatedly massaged Plaintiff's shoulders. These shoulder massages would generally last between one and five seconds and would occur while Plaintiff was working on his computer in his cubicle. McNeill would stand behind him, put both hands on Plaintiff's shoulders and squeeze and rub his thumbs in a circular motion. While doing this, McNeill said nothing, or made small talk. According to Plaintiff, McNeill massaged his shoulders about thirty times between June 1999 and December 10, 1999. McNeill admits that he touched Plaintiff's shoulders on approximately three occasions. Plaintiff testified that he first asked McNeill to stop touching him on July 13, 1999. McNeill denies that Plaintiff ever asked him to stop touching his shoulders.

Plaintiff thought McNeill was massaging his shoulders for sexual reasons. Plaintiff alleges that on one occasion McNeill asked him "Are you trying to get sexy on me?" McNeill denies making the "getting sexy" comment. It is unclear whether Plaintiff believes that McNeill made this comment while massaging his shoulders; or whether Plaintiff believes McNeill was commenting on Plaintiff's attire one day, when his shirt was unbuttoned at the top and his sleeves rolled up. Plaintiff testified that the "getting sexy" comment was the only comment he could recall McNeill making, that was sexual in nature. However, Plaintiff testified that McNeill also made reference to an "alternative life style magazine."

Plaintiff believes that by massaging his shoulders, McNeill intended to solicit sexual favors from Plaintiff, because "it did not appear to be normal for a guy to massage another guy's back" and because McNeill would tell him that Ramsey, the boss, was not pleased with the team's performance and McNeill could help Plaintiff look better in Ramsey's eyes.

Plaintiff "is not sure" about McNeill's sexual orientation, although he knows that McNeill is married. Plaintiff believes that McNeill "might" desire a homosexual experience because McNeill continued to rub Plaintiff's shoulders after Plaintiff asked McNeill to stop doing so. Plaintiff also believes that McNeill might desire homosexual experiences because McNeill told him he had friends with "alternative lifestyles," although he admits that this fact "does not necessarily mean that he desires that," but it "would be an indicator." Plaintiff understands that in a work environment people will sometimes touch others on the shoulders and say "good job." He does not believe that such conduct is inappropriate. McNeill denies that he is homosexual or that he has ever desired a homosexual experience.

McNeill gave Plaintiff a written warning on October 19, 1999 for performance issues, including his failure to keep the BTS Order Log updated, failure to update the BTS order project on a timely basis, and Plaintiff's general inability to follow through with projects, meet deadlines, and manage his time and priorities. Plaintiff characterizes these performance issues as "extremely minor" and insufficient to warrant corrective action. Plaintiff met with Kim Klosak in Sprint's Human Resources department shortly after receiving the written warning to discuss the fact that he believed the issues raised were either untrue or petty.

Jim Ramsey concurred with the issues raised in the October 1999 written warning. Ramsey noted that Plaintiff was often late to meetings, often unable to com-

plete projects in a timely fashion, and sometimes Plaintiff presented incomplete work product to Ramsey. Plaintiff concedes that he was "probably" late getting Jim Ramsey information during 1999 and that he was sometimes late for meetings. Plaintiff agrees that he was late providing the Lucent Optimization Pricing Project, although he believes the deadline was "soft" and of less concern because he ultimately saved the company money and reached a good result. However, Plaintiff attributed his tardiness providing McNeill information for Lucent contract review issues to the inability of other departments to commit to specific dates within the allotted time.

McNeill did not give Plaintiff a verbal warning before issuing this written warning in October, 1999. However, before the written warning in October, 1999, there was a meeting in June 1999 where Ramsey's displeasure with the Lucent team in general, and Plaintiff's performance in particular, was noted. Ramsey was aware of this June meeting, as well as one or two follow-up meetings. McNeill had characterized the June meeting as not a verbal counseling, but as setting the stage for future feedback. Ramsey stated that McNeill told Ramsey that other Sprint employees had complained that Plaintiff was not responsive to their concerns, although these concerns were not documented in the 1999 annual review.

Defendant's corrective action procedure consisted of a verbal warning, a written warning and a final written warning. But Defendant's "Employee Human Resources Policy Guide,"[3] which sets forth the same three levels of action, provides that "[t]he level of entry into the Corrective Action Process is dependent on the seriousness of the situation and is determined on a case-by-case basis."

Plaintiff admits that until he made an official complaint to Ramsey on December 10, 1999, Ramsey was unaware that McNeill was massaging Plaintiff's shoulders, and that Plaintiff believed McNeill's conduct was inappropriate. About two months after Plaintiff made this official complaint to Ramsey, on February 16, 2000, Plaintiff received his LINK Performance Review, which evaluated his work for calendar year 1999. In this evaluation, Plaintiff received the lowest possible score, a "5" on a scale from 1 to 5 (1 being the best and 5 being "unacceptable"). Jim Ramsey concurred in this evaluation of Plaintiff.

Notably, McNeill, who performed the evaluation and authored the evaluation report, initially proposed a rating of "4" for Plaintiff, but according to McNeill, Defendant's Human Resources Department recommended that the rating be changed to a "5". McNeill acknowledged that Plaintiff should have received a 4, rather than a 5, because Plaintiff had met some of the objectives in this 1999 LINK.

Plaintiff testified that in addition to raising petty concerns in the October 1999 written warning, McNeill made false statements in his 1999 annual evaluation of Plaintiff. For example, McNeill wrote that "a request by the VCM director for a follow-up study to determine if any true savings had been realized has not yet been accomplished." Yet, Plaintiff had produced the brief for this follow-up study on its due date, February 15, 2000. McNeill signed and dated the 1999 annual evaluation on February 16, 2000, just one day after receiving Plaintiff's brief.

Plaintiff believes that the 1999 annual evaluation contained an inaccurate summary of his performance in retaliation for

---

**3.** The Court notes that the Guide is dated 1/1/99 and provides that Defendant reserves the right to change any policies, etc., at any time.

his filing a complaint of same-sex harassment because "[t]here is no other reason I can think of for somebody to go out of their way to make up lies in an evaluation of an employee" and because the evaluation was allowed to stand. The "5" rating which McNeill acknowledged was not appropriate, was not amended until October 2000, after Plaintiff received a "3" rating for the first quarter of 2000.

Ramsey believed that after January 2000, Plaintiff's work on the BTS log improved, but that other performance issues persisted. Plaintiff's performance in the first quarter of 2000 was rated a "3", but this improvement was not recognized until October 2000, when the first quarter performance evaluation was issued. Plaintiff believes that Jim Ramsey deliberately delayed giving him the First Quarter 2000 evaluation, although he admits that he does not know why he believes this delay was because of the fact that he had made a prior complaint of harassment.

In approximately May 2000 Plaintiff was transferred from Roger McNeill's supervision to Natalie Kohrs supervision. When Plaintiff began working for Ms. Kohrs he switched from working with the Lucent contracts to working with the Samsung contracts. Plaintiff had no issues with the way he was treated by Ms. Kohrs nor does he believe the reviews she provided him were retaliatory. Plaintiff received a "3" on his 2000 annual review (given in January 2001) and a three percent pay raise.

Plaintiff worked for Kohrs until January 2001 when Jenice Lewis became his supervisor. Plaintiff believes that under Lewis's supervision he was denied promotions and/or transfers in retaliation for complaining of same-sex harassment. Plaintiff never told Jenice Lewis that he made a complaint of same-sex harassment about Roger McNeill. Although Jenice Lewis may not have known until May 2002 of the specific allegation that McNeill inappropri-

ately touched Plaintiff, there is evidence that she was aware of Plaintiff's complaint and legal initiative by February 13, 2001.

Plaintiff had no problems working under Jenice Lewis' supervision until she gave him a oral warning on May 30, 2001 about issues of "personal effectiveness, work performance, professionalism, and time management." Plaintiff thought the issues about tardiness, office absences and missed meetings were "petty," because he thought Lewis was also guilty of these things. Plaintiff disagreed with the "ineffective communications" issue, because he believed that it was Lewis' fault that he did not have information available. While Plaintiff disputes Lewis's warning that Plaintiff had missed 15 deadlines, he concedes he missed some deadlines, but an insufficient number to warrant corrective action. Plaintiff's Personal Action Item List (PAIL) dated June 4, 2001, includes data that refutes Lewis's allegation that he missed 15 deadlines. It shows that Plaintiff was ahead of schedule on 64 items, that 110 items were completed on time, and 8 deadlines were missed. But, of those 8, four of the deadlines were assigned to Lewis, not Plaintiff; and Plaintiff missed two of the deadlines because of the action or inaction of third parties.

Lewis issued Plaintiff a written warning on July 24, 2001 for many of the same "petty," "exaggerated," and untrue issues raised in the oral warning. On September 21, 2001, Lewis issued a final written warning, for many of the same issues raised in the oral and written warning. And, Plaintiff alleges that during his 2001 annual evaluation, Lewis disregarded Plaintiff's input of facts that demonstrated he had met Objective #4, and had followed her direction. Kevin Neur (who replaced Ramsey) testified, however, that Plaintiff failed to meet an objective established for the third quarter of 2001, producing a work product that was months

late and responsive to only one of the 27 separate items in the assignment.

Plaintiff further asserts that he was subjected to retaliation by Defendant's failure to promote him, while all of his peers were promoted two or three times and he was not. Plaintiff admits that he does not know if any of the promotions or transfers he applied for from October 2000, when he received a "3" rating for the first quarter 2000, to date, were promotions denied because of his complaint of same-sex harassment.

Plaintiff did not apply for various project manager and program manager positions in December 2000 and February 2001, because he thought the October 1999 warning and the "5" rating would exclude him from consideration for these jobs. Since December 1999, Plaintiff has applied for only four positions.[4] In May 2001 Plaintiff applied for a Level 78 Manager Quality Tech Services Position. He was not given an interview; and Plaintiff does not know why his resume was not given to the hiring manager for this position. In June 2001, Plaintiff applied for a Level 79 Manager, Affiliations Position. Plaintiff admits he does not know why he was not hired for this position. Plaintiff also interviewed for a Level 75 position in Ana Valdez' group. But Plaintiff does not attribute not receiving this position to his earlier complaint of sexual harassment.

During the time Jenice Lewis was his supervisor, Plaintiff applied for a Program Manager IV position. He was interviewed but not hired. Plaintiff does not know who was hired for the position. Plaintiff has no information suggesting that Jim Ramsey ever provided negative feedback with regard to any job transfers or promotions for which he applied.

Plaintiff dual-filed his Charge of Discrimination with the EEOC and Kansas Human Rights Commission ("KHRC") on August 20, 2000. The Charge of Discrimination alleges that Plaintiff was issued a written warning and an unsatisfactory performance evaluation in retaliation for filing his complaint of sexual harassment. The Charge of Discrimination indicates that the earliest discrimination took place in June 1999 and that the latest date of discrimination was February 16, 2000. Plaintiff did not check the "continuing" box on the Charge of Discrimination. Plaintiff filed this lawsuit on July 20, 2001, alleging that he was retaliated against for complaining of sexual harassment by being presented with delayed and false performance evaluations and by being denied unspecified promotions and transfers. Plaintiff remained employed in his Program Manager position at Sprint PCS throughout the entire time period relevant to this suit and remains employed in this position today.

Plaintiff claims that he will necessarily retire at a lower pay grade level when he retires from Sprint in 2019 because he was denied two to three grade level promotions from 1999 through 2001. No employee in the Vendor and Contract Management Group at Defendant had a job grade until approximately April 1999. At that time, employees received job grades for the first time and Plaintiff, Natalie Kohrs and John Sorrentino were Program Managers in the Vendor and Contract Management Group and had job grades of 76. In approximately April of 1999, John Burgess was a Manager/Contract and Engineering and had a job grade of 77. Sorrentino is currently a job grade 79; Kohrs is on unpaid leave of absence and was a. 79 when she started this leave; Burgess is currently a job grade 78; and Plaintiff is still a 76. The three managers one step above Plaintiff were 78's when Plaintiff started and now one is a 79 and the other two are directors.

---

4. "Applications" at Sprint are sometimes referred to as "JIR's" (Job Interest Requests).

Plaintiff believes that he will receive multiple promotions before he retires from Sprint and that he will retire in an executive position because most of the people working in the same management type positions (vendor and contract management) progress on to executive level positions.

## CONCLUSIONS OF LAW

### Summary Judgment:

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [5] In applying this standard, the Court must "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." [6] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." [7] A factual dispute is "material" only if "under the substantive law it is essential to the proper disposition of the claim." [8] If the party bearing the burden of persuasion at trial fails to come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial. [9]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." [10] A movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim, and may make its prima facie demonstration by simply pointing out the lack of evidence for the nonmovant on an essential element of the nonmovant's claim." [11]

If the movant meets this initial burden, "the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." [12] In order to do this, "the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." [13]

### Administrative Exhaustion

■ Defendant argues that this Court does not have subject matter jurisdiction over Plaintiff's complaints of retaliation after February 2000, because Plaintiff failed to exhaust those claims at the administrative level. A plaintiff must exhaust his or her administrative remedies before filing a Title VII case. [14] The exhaustion require-

5. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir. 1993).

6. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citations omitted).

7. *Id.* (citation omitted).

8. *Id.* (citation omitted).

9. *Id.* (citation omitted).

10. *Id.* at 670–71 (citation omitted).

11. *Id.* at 671 (citation omitted).

12. *Id.* (citations omitted); *see also* Fed. R.Civ.P. 56(e).

13. *Id.*(citation omitted).

14. *Jones v. Denver Post Corp.*, 203 F.3d 748, 755 (10th Cir.2000) (citation omitted). The exhaustion requirement applies to KAAD claims as well. *See, e.g., Rhodes v. Schaefer*, 2002 WL 826471 at *5 (D.Kan.2002) (quoting *Davidson v. MAC Equip. Inc.*, 878 F.Supp. 186, 189 (D.Kan.1995) (stating that before a

ment serves two purposes: "to give notice of the alleged violation to the charged party, and to give the EEOC an opportunity to conciliate the claim, which effectuates Title VII's goal of securing voluntary compliance." [15] If a complaint were allowed to encompass allegations outside the ambit of the predicate charge, this would circumvent the administrative agency's investigatory and conciliatory role and deprive the charged party of notice of the charge.[16]

 In general, a plaintiff may not bring a claim unless it was part of the timely-filed administrative charge.[17] The Tenth Circuit "has adopted a limited exception to the exhaustion rule." [18] "The suit may include allegations of discrimination reasonably related to the allegations listed in the administrative charge, including new acts occurring during the pendency of the administrative charge." [19] Where the conduct alleged would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made, consideration of complaints not expressly included in the EEOC charge would be appropriate.[20] Any act committed by the employer in retaliation for the filing of an EEOC complaint is reasonably related to that complaint, and there is no need for a second EEOC complaint.[21] In *Ingels*, the Tenth Circuit noted that:

> This is a sound rule, because the main functions of the requirement of an EEOC charge have already been fulfilled, and requiring a second trip to the state or federal administrative agencies to allege retaliation occurring during the pendency of a judicial proceeding would not achieve any purpose and would simply prolong and perhaps bifurcate the judicial proceeding. There are two purposes behind the requirement for administrative exhaustion in discrimination cases: 1) to give notice of the alleged violation to the charged party; and 2) to give the EEOC an opportunity to conciliate the claim, which effectuates Title VII's goal of securing voluntary compliance. . . . In the retaliation context, notice has already been given and there is little likelihood that a second administrative complaint would lead to conciliation: . . . 'Indeed, requiring a plaintiff to file a second EEOC charge under these circumstances could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions

plaintiff may litigate any KAAD claims in court, plaintiff must first receive an unfavorable determination from the KHRC, file for reconsideration of that unfavorable determination and then receive a denial of the reconsideration application); K.S.A. 44–1010 ("No cause of action arising out of any order or decision of the commission shall accrue in any court to any party unless such party shall petition for reconsideration as herein provided.").

**15.** *Smith v. Board of Public Utils.*, 38 F.Supp.2d 1272, 1284 (D.Kan.1999) (citation omitted).

**16.** *Id.* (citation omitted).

**17.** *Wallace v. Beech Aircraft Corp.*, 87 F.Supp.2d 1138, 1146 (D.Kan.2000) (*citing Simms v. Oklahoma ex rel. Dept. of Mental*

*Health*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied* 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999)).

**18.** *Id.*

**19.** *Jones v. Denver Post Corp.*, 203 F.3d at 755 (*citing Aramburu v. Boeing Co.*, 112 F.3d 1398, 1409 (10th Cir.1997)).

**20.** *Smith v. Board of Public Utils.*, 38 F.Supp.2d at 1284 (*citing Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1416 n. 7 (10th Cir.1993)).

**21.** *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir.1994) (citations omitted).

relating to the underlying acts of discrimination.'[22]

Complaints to the EEOC "must be liberally construed in order to accomplish the purposes of the Act, since such complaints are written by laymen not versed either in the technicalities of pleading or the jurisdictional requirements of the Act."[23]

Plaintiff dual-filed his Charge of Discrimination with the EEOC and Kansas Human Rights Commission ("KHRC") on August 20, 2000. The Charge of Discrimination alleges that Plaintiff was issued a written warning and an unsatisfactory performance evaluation in retaliation for filing his complaint of sexual harassment. The Charge of Discrimination indicates that the earliest discrimination took place in June 1999 and that the latest date of discrimination was February 16, 2000. Plaintiff did not check the "continuing" box on the Charge of Discrimination.

 Plaintiff filed this lawsuit on July 20, 2001, alleging that he was retaliated against for complaining of sexual harassment, being given delayed and false performance evaluations and being denied unspecified promotions and transfers. The Court finds that the 2001 conduct is reasonably related to the charges in the EEOC complaint and the conduct alleged would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made. The conduct is allegedly retaliatory, and any act committed by the employer in retaliation for the filing of an EEOC complaint is reasonably related to that complaint, and there is no need for a second EEOC complaint.[24]

**Harassment:**

 Same-sex harassment is recognized under Title VII.[25] Because such claims are analyzed the same under Title VII and the KAAD,[26] the Court's analysis under Title VII applies to Plaintiff's claims under the KAAD, as well.

 Sexual harassment under Title VII can be shown by either *quid pro quo* discrimination or a hostile work environment.[27] Plaintiff alleges *quid pro quo* harassment, requiring Plaintiff to show that concrete employment benefits were conditioned on submission to sexual conduct.[28] Although the Supreme Court's decision in *Oncale*[29] dealt with a hostile work environment claim, the Court made it clear that Title VII prohibits "discrimina[tion] ... because of ... sex" in the "terms" or "conditions" of employment.[30] Although

---

22. *Id.* (citations omitted).

23. *Aguirre v. McCaw RCC Communications, Inc.*, 923 F.Supp. 1431, 1434 (D.Kan.1996) (citation omitted).

24. *Ingels*, 42 F.3d at 625 (citations omitted).

25. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

26. *See, e.g., Best v. State Farm Mutual Automobile Ins. Co.*, 953 F.2d 1477, 1480 n. 2 (10th Cir.1991); *Roberts v. The Signature Group*, 1996 WL 707106 at n. 5 (D.Kan.1996) (citing *Woods v. Midwest Conveyor Co., Inc.*, 231 Kan. 763, 767, 648 P.2d 234 (1982)).

27. *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993).

28. *Id.* at 1416 (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir.1987)).

29. *Oncale*, 523 U.S. at 79–80, 118 S.Ct. 998.

30. *See also Burlington Indus. v. Ellerth*, 524 U.S. 742, 753–54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (noting the difference between hostile work environment and *quid pro quo* claims and stating that when a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII, and for sexual harassment preceding the employment decision the conduct must be severe or pervasive).

various courts have stated the elements for a prima facie case in *quid pro quo* cases somewhat differently,[31] both parties agree that the "because of sex" requirement is essential to Plaintiff's prima facie case.

 The Plaintiff must show that the harassment constitutes discrimination "because of sex." Harassment is not necessarily discrimination because of sex, merely because the words used have sexual content or connotations.[32] The conduct must actually constitute discrimination because of sex, and not be merely tinged with offensive sexual connotation.[33] Instead, the critical issue for a Title VII claim "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.[34]

The Supreme Court has suggested three evidentiary routes to prove conduct is "because of sex" in same-sex cases: 1) evidence that the harasser is homosexual and the harassment is motivated by sexual desire; 2) evidence that the harasser is motivated by a hostility to the presence of the victim's gender in the workplace; or 3) evidence that the harasser treated males and females differently in a mixed-gender workplace.[35] Plaintiff argues that he can establish two evidentiary basis: 1) that McNeill was motivated by sexual desire; or 2) that McNeill treated males and females differently. Plaintiff does not argue that McNeill is motivated by a hostility to the presence of males in the workplace.

 Plaintiff alleges that the shoulder massages, despite Plaintiff's objections, along with the "getting sexy" and "alternative lifestyle" comments, are evidence upon which a jury could infer that McNeill is homosexual or that McNeill's conduct was motivated by sexual desire. The court in *Oncale* noted that in most male-female sexual harassment situations the inference of discrimination is easy to draw "because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex." [36] For the same chain of inference to be available to a plaintiff alleging same-sex harassment, there must be credible evidence that the harasser was homosexual.[37]

---

31. *See, e.g., Martin v. Nannie and the Newborns, Inc.*, 3 F.3d at 1416–17 (stating that plaintiff's quid pro quo claim is one for wrongful termination and using the elements for a wrongful termination claim); *Benhardt v. Board of County Comm'rs*, 9 F.Supp.2d 1252, 1261 (D.Kan.1998) (stating that plaintiff must show that (1) she is a member of a protected class, (2) she was subject to unwelcome sexual conduct, (3) concrete job benefits were conditioned on submission to the sexual conduct, and (4) adverse job consequences resulted from the employee's refusal to submit to the conduct); *Perez v. Interconnect Devices Inc.*, 1998 WL 781220 at *9 (D.Kan.1998) (stating that plaintiff must establish (1) that his supervisor had authority to materially alter the terms and conditions of plaintiff's employment; (2) that his supervisor demanded sexual favors; and (3) that plaintiff's rejection of his supervisor's demands resulted in a job detriment); *Roberts v. Air Capitol Plating,*

*Inc.*, 1997 WL 446266 at * 17 (D.Kan.1997) (stating that plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to unwelcome advances or demands; (3) the advances or demands were based on her sex; and (4) her reaction to the unwelcome behavior affected tangible aspects of her compensation, or terms, conditions or privileges of employment).

32. *Oncale*, 523 U.S. at 80, 118 S.Ct. 998.

33. *Id.* at 81, 118 S.Ct. 998.

34. *Id.* at 80, 118 S.Ct. 998 (citation omitted).

35. *Id.* at 80–81, 118 S.Ct. 998.

36. *Id.* at 80, 118 S.Ct. 998.

37. *Id.*

The Court finds that there is no credible evidence that McNeill is homosexual or that his conduct was motivated by sexual desire. Plaintiff admits that he is not sure about McNeill's sexual orientation, although he knows that McNeill is married. Plaintiff believes that McNeill might desire a homosexual experience because McNeill continued to rub Plaintiff's shoulders after Plaintiff asked him to stop; and because McNeill told him he had friends with "alternative lifestyles," although he admits that this fact "does not necessarily mean that he desires that," but it "would be an indicator." McNeill denies that he is homosexual or that he has ever desired a homosexual experience. None of this evidence constitutes "credible evidence" that McNeill is homosexual or his conduct is motivated by sexual desire. Rather, it amounts to nothing more than speculative suppositions which are insufficient to avoid summary judgment.[38]

▮ Plaintiff argues that McNeill treated males and females differently, pointing to McNeill's deposition testimony that he did not touch, in a similar fashion, any female co-workers during the same time frame.[39] Thus, Plaintiff argues, female members of the workforce were not exposed to the same disadvantageous terms or conditions of employment as Plaintiff. But, McNeill testified that he could not name *any* other co-workers that he touched in a similar fashion during the same time frame. Plaintiff has not shown that McNeill treated men differently than women, but only that he treated Plaintiff differently than all other employees of Defendant, whether male or female. The court in *Davis*,[40] stated that evidence that a male alleged harasser treated a same-sex plaintiff differently than both males and females "actually undermines [plaintiff's] claim: It suggests that [the alleged harasser] targeted [plaintiff] because of his behavior as an individual rather than because of his sex."

Plaintiff has not shown that he was discriminated against "because of sex." Defendant's motion for summary judgment on Plaintiff's *quid pro quo* sexual harassment claim is granted.

**Retaliation:**

▮ The Plaintiff need not prevail on the underlying claim of discrimination in order to pursue his retaliation claim.[41] Title VII retaliation claims proceed under the familiar *McDonnell Douglas*[42] burden shifting analysis.[43] Under the *McDonnell*

---

**38.** *See, e.g., English v. Pohanka of Chantilly, Inc.,* 190 F.Supp.2d 833, 846 (E.D.Va.2002) (summary judgment appropriate where plaintiff has no reason other than the mere fact of the behavior of which he complains to believe that his supervisor is homosexual since plaintiff cannot rely on his subjective belief that supervisor was homosexual to meet his evidentiary burden); *Davis v. Coastal Int'l Security, Inc.,* 275 F.3d 1119, 1123 (D.C.Cir.2002) (same-sex plaintiff failed to establish that alleged harasser was homosexual or motivated by sexual desire since plaintiff had no reason "other than the behavior of which he complains" to support his contention).

**39.** The Court notes that Plaintiff does not mention this evidence in the factual contentions, but rather raises it in the argument section of his brief. *See* D. Kan. R. 56.1(b)(2).

However, Defendant has adequately controverted this factual assertion with reference to the deposition testimony.

**40.** 275 F.3d at 1124.

**41.** *Ingels v. Thiokol Corp.,* 42 F.3d 616, 625 n. 8 (10th Cir.1994) (citations omitted); *see also Love v. RE/MAX of America, Inc.,* 738 F.2d 383, 385 (10th Cir.1984) (applying this principle in a Title VII anti-retaliation claim).

**42.** *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**43.** *See McGarry v. Bd. of County Comm'rs,* 175 F.3d 1193, 1201 (10th Cir.1999); *Lundien v. United Airlines,* 242 F.3d 389, 2000 WL 1786579 (10th Cir.2000).

*Douglas* framework, the plaintiff must first present a prima facie case of retaliation.[44] Then, the burden of production shifts to the defendant to produce a legitimate, non-discriminatory justification for taking the action in question.[45] Finally, the burden shifts back to the plaintiff to show the defendant's reason for its action was merely a pretext for discrimination.[46]

## A. Prima Facie Case

■ To establish a prima facie case of retaliation, Plaintiff must show: (1) he engaged in protected opposition to discrimination or participated in a proceeding arising out of discrimination; (2) he was subjected to adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.[47]

### Protected Activity

■ Title VII prohibits retaliation against an employee because he or she "has opposed any practice made an unlawful employment practice by" Title VII.[48] Plaintiff has shown that he engaged in protected activity.

### Adverse Employment Action

■ Next, Plaintiff must show he was the victim of an adverse employment ac-

tion constituting " 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' "[49] Mere inconvenience does not constitute adverse employment action.[50]

■ Generally, conduct qualifies as an adverse employment action if it "constitutes a significant change in [the plaintiff's] employment status."[51] The Tenth Circuit liberally defines "adverse employment action."[52] It is not limited to monetary losses in the form of wages or benefits.[53] Verbal interrogation and reprimand, threats to withdraw supervision and not renew the employee's contract are sufficient.[54] Other examples of sufficient adverse action include: decisions that have a demonstrable impact on future employment opportunities or performances; demotions; adverse or unjustified evaluations and reports; transfer or reassignment of duties; failure to promote; unfavorable letters of reference to prospective employers;[55] and requiring the employee to "go through several hoops" in order to obtain severance benefits.[56] Specifically, the circuit has declined to adopt a "materiality" requirement and, rather, takes a "case by case

---

44. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

45. *Id.*

46. *Id.* at 804, 93 S.Ct. 1817.

47. *Kendrick v. Penske Trans. Servs., Inc.,* 220 F.3d 1220, 1234 (10th Cir.2000).

48. 42 U.S.C. § 2000e–3(a).

49. *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 532 (10th Cir.1998) (quoting *Burlington Indus., Inc., v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

50. *Id.*

51. *Burlington Industries. Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

52. *See Jeffries v. State of Kan.,* 147 F.3d 1220, 1232 (10th Cir.1998).

53. *Unrein v. Payless Shoesource, Inc.,* 51 F.Supp.2d 1195, 1210 (D.Kan.1999) (citation omitted)

54. *Id.* (citing *Jeffries v. State of Kansas,* 147 F.3d 1220, 1232–33 (10th Cir.1998)).

55. *Id.* at 1210–11 (citations omitted).

56. *Corneveaux v. CUNA Mut. Ins. Group,* 76 F.3d 1498, 1507 (10th Cir.1996).

approach" to determining whether a given employment action is "adverse." [57]

■ Plaintiff has shown that Defendant's actions impacted Plaintiff's future employment opportunities.[58] Receiving the written warning in October 1999 and the "5" rating on his 1999 annual evaluation, made Plaintiff ineligible for transfer or promotion. Delaying Plaintiff's first quarter 2000 evaluation until October 2000, rendered Plaintiff ineligible for another six months. Plaintiff further claims adverse employment action in the form of verbal, written and final written warnings in 2001 and denial of transfers or promotions (the May 2001 Level 78, Manager Quality Tech Services position and the June 2001 Level 79 Manager, Affiliations position).[59] Thus, under the Tenth Circuit's liberal definition, these actions constitute adverse employment action.

### Causal Connection

■ Plaintiff must further show a causal connection existed between the protected activity and the adverse employment action. This requires showing that the alleged retaliatory acts were committed by an individual or individuals who were aware or should have been aware of plaintiff's participation in the protected activity.[60] Plaintiff can establish a causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." [61] The temporal proximity between the protected activity and the retaliatory conduct must be very close or plaintiff must offer additional evidence to establish causation.[62] For example, a one and one-half month period between the protected activity and the adverse action, may by itself, establish causation. But, the Tenth Circuit has held that a lapse of three months between the protected activity and the employer's action is too long a period of time, by itself, to allow an inference of causation.[63]

■ Plaintiff has shown a sufficient causal connection to survive summary judgment. Although the October 1999 warning occurred three months after his July 13, 1999 complaint to McNeill, the 1999 annual evaluation issued on February 16, 2000, closely followed Plaintiff's official complaint to Ramsey on December 10, 1999. And, both McNeill and Ramsey

---

**57.** *See id.*

**58.** Plaintiff alleges that being under the "5" rating left him ineligible for transfer or promotion. Defendant provides testimony from its HR Representative alleging that while under that rating, Plaintiff could have applied for open positions with the approval of his manager and director and could apply for open positions when he was on written warning in October 1999 with vice-president approval. Defendant did not offer evidence that Plaintiff was aware of this apparent exception. In any event, Plaintiff's employment opportunities were still impacted.

**59.** Plaintiff admits that he does not believe his failure to be selected for the Level 75 position in Ana Valdez' group had anything to do with his earlier complaint of harassment.

**60.** *See Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1265 (10th Cir.1998) (holding that a retaliatory discharge claim must be predicated on intentional or knowing retaliation).

**61.** *Burrus v. United Tel. Co. of Kan., Inc.,* 683 F.2d 339, 343 (10th Cir.1982), *cert. denied* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982); *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1320 (10th Cir.1999). *See also Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999) (assuming that temporal proximity of two months and one week is sufficient to support a prima facie case of retaliation).

**62.** *O'Neal v. Ferguson Constr., Co.,* 237 F.3d 1248, 1253 (10th Cir.2001).

**63.** *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997).

were aware of Plaintiff's protected activity when the negative evaluations were issued. Likewise, while the May 2001 verbal warning and the June 2001 failure to promote occurred 9 months after Plaintiff's EEOC and KHRC filings, the July 2001 written warning and September 2001 final written warning occurred, respectively, just 4 days and two months after Plaintiff filed the lawsuit. Lewis was likewise aware of Plaintiff's complaint and legal initiative by February 13, 2001. With the temporal proximity of the protected activity and the retaliatory conduct, as well as additional evidence of causation (see the discussion under Pretext), Plaintiff has established a causal connection sufficient to support his prima facie case.[64]

### B. Facially Nondiscriminatory Justification

Because Plaintiff has established his prima facie case, the burden shifts to Defendant to proffer a non-discriminatory reason for its actions. Defendant has met this burden. Plaintiff concedes that he was "probably" late getting information to Jim Ramsey during 1999. Plaintiff agrees that he was late providing the Lucent Optimization Pricing Project, although he believed the deadline was "soft" and of less concern because he ultimately saved the company money and reached a good result. Plaintiff also concedes that he was sometimes late for meetings. Ramsey further asserts that at times, Plaintiff produced incomplete work product. This is confirmed by Kevin Neur's testimony that Plaintiff failed to meet his third quarter 2001 objective, by submitting work product that was months late and responsive to only one of the 27 separate items in the assignment. And, under Jenice Lewis's supervision, Plaintiff reportedly continued to miss deadlines. While Plaintiff disputes Lewis's claim that he missed 15 deadlines, he admits that he missed some deadlines.

### C. Pretext

Because Defendant has proffered a nondiscriminatory reason for its actions, the burden shifts back to Plaintiff to demonstrate that the reasons given by the Defendant are pretextual. Plaintiff can meet his burden by showing "that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e. unworthy of belief."[65]

There are three ways to establish pretext: 1) presenting evidence that defendant's stated reason for the adverse action was false; 2) presenting evidence that defendant acted contrary to written company policy; or 3) presenting evidence that defendant acted contrary to an unwritten policy or practice.[66]

When reviewing plaintiff's evidence of pretext, the Court examines facts "as they appear to the person making the decision" that adversely affected plaintiff.[67] "Mere conjecture that the employer's explanation is pretext for intentional discrimination is an insufficient basis for denial of summary judgment." '[68] The Court may not second guess the business judgment of the employer.[69] The same facts relied on

---

64. *See Robinson v. Wilson Concrete Co.,* 913 F.Supp. 1476, 1483 (D.Kan.1996) ("A claimant's 'prima facie case is not an onerous burden under the *McDonnell–Douglas* burden-shifting scheme.' ").

65. *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995).

66. *Kendrick,* 220 F.3d at 1230.

67. *Kendrick,* 220 F.3d at 1231.

68. *Morgan v. Hilti,* 108 F.3d 1319, 1323 (10th Cir.1997) (quoting *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988))..

69. *Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir.1999).

to establish Plaintiff's prima facie case can support a showing of pretext. "Although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.' "[70] While it is true that close proximity between a protected activity and an adverse employment action is a factor in determining whether the defendant's proffered reason is a pretext for retaliation,[71] it is not, by itself, sufficient to raise an issue of fact.[72] Thus, it must be determined whether Plaintiff offers additional evidence of pretext.

■ Viewing Plaintiff's evidence in the light most favorable to him and drawing reasonable inferences therefrom, the Court finds that a reasonable jury could find Defendant's proffered reasons were a pretext for retaliation. There is evidence that the 1999 annual evaluation contained false statements about Plaintiff's performance. Although McNeill proposed giving Plaintiff a "4" in the 1999 evaluation, in recognition that Plaintiff had met some objectives, the rating was changed to a "5" as the Human Resource Department recommended. This faulty rating was not amended until October 2000, after Plaintiff received a "3" rating for the first quarter of 2000. And, although Plaintiff's performance in the first quarter of 2000 had improved, his improvement was not immediately recognized, because Defendant delayed issuing this first quarter 2000 evaluation until October 2000. There is also evidence that Plaintiff's failure to meet deadlines in 2001 was overstated by Jenice Lewis and that some missed deadlines were wrongly attributed to Plaintiff. The Court finds that a reasonable jury could find Defendant's proffered reasons for its adverse actions are pretextual. Accordingly, summary judgment on Plaintiff's retaliation claims is denied.

**Plaintiff's Front Pay**

■ Defendant argues that Plaintiff's front pay claim fails as a matter of law because it is based entirely on guesswork and speculation. Plaintiff is claiming front pay damages of over $700,000 due to lost promotional opportunities resulting from his complaints of harassment.[73] Plaintiff believes that he was denied promotions and/or transfers in retaliation for complaining of same-sex harassment because all of his peers were promoted two or three times and he was not. Plaintiff claims he will necessarily retire at a lower pay grade level when he retires from Sprint in 2019 because he was denied two to three grade level promotions from 1999 through 2001.

The Court finds that Defendant is not entitled to judgment as a matter of law on this issue.[74] All of the evidence presented at trial should be considered in formulating the proper award.[75] In *Deghand v.*

---

70. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citation omitted and ellipses in original) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

71. *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir.2000) (citing *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 551 (10th Cir. 1999)).

72. *Id.*

73. June 5, 2002 Pretrial Order at p. 12.

74. *See Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir.1995) (finding that weaknesses in the data upon which the expert relied go to the weight the jury should have given her opinions and did not render her testimony too speculative as a matter of law).

75. *See, Davoll v. Webb*, 194 F.3d 1116, 1144 (10th Cir.1999).

*Wal–Mart Stores, Inc.,*[76] the court noted that there are unsettled issues regarding whether front pay is a jury issue or whether it is reserved for the court. In any event, the court found that the issues could be addressed in a post trial decision, and found that:

> The defendant's arguments against submitting front pay to the jury are not suited for a ruling in limine and presumably will be argued and considered in the jury instructions. The defendant may renew its arguments during trial after the court has had an opportunity to hear the plaintiff's evidence in these areas. The court denies the defendant's motion in limine concerning the evidence and testimony on front pay.[77]

Defendant's arguments can be addressed in the jury instructions or the matter can be addressed in a post trial decision. Defendant is not entitled to summary judgment on the front pay issue.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Sprint Spectrum, L.P.'s Motion for Summary Judgment (Doc. 26) shall be GRANTED IN PART AND DENIED IN PART in accordance with this Memorandum and Order.

IT IS SO ORDERED.

---

**76.** 980 F.Supp. 1176, 1181 (D.Kan.1997).

