**Jim SISCO, Plaintiff(s),**

v.

**FABRICATION TECHNOLOGIES, INC., Larry Rubis, and Greg Andress, Defendant(s).**

No. 03–CV–1069–D.

United States District Court, D. Wyoming.

Dec. 22, 2004.

Jeffrey C. Gosman, Casper, WY, for Plaintiff.

J. Kenneth Barbe, II, Brown Drew & Massey, Casper, WY, for Defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DOWNES, District Judge.

This matter comes before the Court on Defendants Fabrication Technologies, Inc., Larry Rubis, and Greg Andress' Motion for Summary Judgment. The Court, having carefully considered the materials submitted in support and opposition, having heard oral argument, and being otherwise fully advised, FINDS and ORDERS as follows:

### BACKGROUND

This is a case of alleged same-sex sexual harassment. The Plaintiff Jim Sisco was employed by Fabrication Technologies, Inc. ("Fab Tech") in October of 2000. Fab Tech's primary business is industrial fabrication. Started by Defendant Larry Rubis in early 2000, Fab Tech's business grew over the next year and had a workforce of 31 employees by August of 2001. The business premises of Fab Tech consists of a large shop called the "upper shop" and a separate shop several hundred feet away called the "lower shop." The upper shop has an office space attached where clerical employees work. Some of the clerical workers have been women, but the workforce in the shops themselves is, and always was during Mr. Sisco's employment, entirely male.

When Mr. Sisco began work, his first job was sandblasting. Mr. Sisco claims that after sandblasting for a few hours he told Mr. Rubis that he could not continue working at Fab Tech if he had to sandblast because it was too hard on his arm and leg, which had been injured in a previous accident. Sisco Depo. at 88. According to Mr. Sisco, Mr. Rubis said that they would work around it because there were plenty of "good, strong kids" to do the sandblasting. *Id.* at 90. Mr. Andress, Mr. Sisco's supervisor, was allegedly present for this exchange. *Id.* Subsequent to that conversation, Mr. Sisco did not have to sandblast except to teach new employees.

In January of 2001, Fab Tech hired Mr. Sisco full time and moved him to the lower shop. About that same time, Fab Tech reached an agreement with a company called NATCO to build certain oil field equipment for them known as Central Distribution Pods (CDPs). The lower shop was primarily used for building the CDPs and Mr. Sisco was assigned as the lead man in the lower shop to supervise the work there. Toward the late fall, 2001, Fab Tech was starting to experience a slowdown, including a slowdown in the CDP work. By February of 2002, Larry Rubis learned that the CDP work was likely to end because NATCO was going to stop using Fab Tech to build CDP units. The CDP work did, in fact, stop by the end of February of 2002. By January of 2002, the workforce at Fab Tech had declined to 26, and by March of 2002, the workforce was down to 22. The number of jobs lined up, still in "the pipeline," at Fab Tech grew from 26 in January of 2001 to 43 in November of 2001. However, by February of 2002, the number of jobs was down to 21 and by March of 2002, the number was down to ten. Mr. Sisco was terminated on March 6, 2002.

Plaintiff claims, through the affidavit of Ms. Rhonda Rice, a clerical worker in the office, that jobs were removed from the job list after Mr. Sisco's formal Charge of Discrimination was received by Mr. Rubis in an effort to make the condition of the company look worse than it was and make the termination of Mr. Sisco appear legitimate. Rice Aff. at ¶ 18. Fab Tech asserts, however, that the reason jobs were removed from the job list was because Burlington Resources, a company that hired Fab Tech for fabrication services, had put a major job on hold in the spring of 2002. Fab Tech had built two water injection packages for Burlington and was scheduled to provide two more. In the spring of 2002, however, Burlington put both units on hold, citing budget constraints. The jobs were removed from the job list. When Burlington indicated in July and December, respectively, that the units should be built, they were returned to the job list.

Mr. Sisco alleges that during his employment at Fab Tech, he was sexually harassed by his supervisor, Greg Andress. The following facts relate Mr. Andress' conduct as Mr. Sisco describes it. Much of this conduct is denied by Mr. Andress. In March or April of 2001, Mr. Sisco alleges that Mr. Andress began calling him "shit stain" when he learned that the term had been used to refer to Mr. Sisco during a previous employment. In response to Mr. Sisco's request that he not use the term to refer to him, Mr. Andress told Mr. Sisco to "suck my dick." Throughout the course of Mr. Sisco's employment, Mr. Andress' conduct toward Mr. Sisco allegedly worsened. Mr. Andress allegedly continued to refer to Mr. Sisco as "shit stain" or "cumguzzler," told Mr. Sisco to "suck my dick," exposed himself to Mr. Sisco while they were alone in the lower shop, and attempted to rub his genitals against Mr. Sisco.

Mr. Sisco claims that the conduct was clearly intended to insult and humiliate.

In September of 2001, Mr. Sisco complained of the name-calling to Larry Rubis. Mr. Rubis called a meeting and told everyone to refer to each other by their given names. Mr. Sisco claims the conduct by Mr. Andress did not stop, but merely escalated thereafter. A turning point in the severity of the conduct seemed to occur in mid October 2001, after Mr. Sisco took Mr. Andress on a deer hunting trip. Mr. Sisco alleges that Mr. Andress offered to pay $3,500 to Mr. Sisco to guide him on the hunt. The two shared a hotel room two nights, but did not get a deer. Mr. Sisco claims Mr. Andress refused to pay him $3,500 for the hunt, and Mr. Andress denies that he ever agreed to pay for the hunt. Mr. Sisco also alleges that on the hunting trip, Mr. Andress told him his wife had had a hysterectomy and that "sex was hard to come by." Mr. Sisco states that he felt uncomfortable being alone with Mr. Andress after this experience and even feared that the comments may have masked a potential sexual desire.

In October of 2001, Mr. Sisco went to see an attorney, John Whitaker, who told him to confront Mr. Andress and tell him he considered his conduct sexual harassment and that he wanted it to stop. Mr. Sisco claims that he did this, but that Mr. Andress' conduct continued to escalate. Mr. Sisco then claims he went to see Mr. Rubis, at the behest of his attorney, to complain and the two discussed a checklist of subjects. Mr. Sisco alleges he: (1) identified the conduct and said he wanted it to stop; (2) identified the conduct as sexual harassment; (3) stated he would file a claim if the conduct continued; (4) stated that sandblasting was in violation of their agreement and that it was injuring him physically; and (5) that the conduct was taking an emotional toll. Although Mr.

Rubis indicated that he would get Mr. Andress' behavior under control, the conduct did not cease, but only worsened.

Mr. Andress allegedly began to urinate on Mr. Sisco's tools, his clothing in his locker, and other objects that Mr. Sisco touched. Mr. Andress urinated on the toilet seat and walls of the restroom and forced Mr. Sisco to clean it up. Mr. Andress allegedly spat upon Mr. Sisco and his workplace. In addition to Mr. Andress' conduct, Mr. Sisco claims he was again required to spend long hours sandblasting. Mr. Sisco states that after November 1, 2001, when he confronted Mr. Andress, he was required to do 90% of all sandblasting. Mr. Andress claims that he spoke to Mr. Rubis for a third time about the conduct in February, 2002, and was allegedly told that if it came down to choosing between him and Mr. Andress, Mr. Sisco would be the one let go.

Mr. Sisco denies participating in the name-calling at Fab Tech, except when on two occasions he called Mr. Andress by the same name used against him in an effort to show that he was man enough to stand up to him. He also denies telling profane jokes, except for the day he arrived, which he describes as an effort to break the ice with his co-workers. Mr. Sisco denies using sexually expressive gestures or profane or sexually charged language, although several of his co-workers submitted affidavits on behalf of Fab Tech detailing this kind of behavior from Mr. Sisco.

As a result of the alleged harassment, Mr. Sisco states he had trouble sleeping, lost over 30 pounds, was nauseated during much of the time, and was vomiting before, during, and after work. He sought treatment from Dr. Reasoner and Fred Lindberg, a psychologist, but only saw each of them on one occasion. In September of 2004, two and a half years after his termination on March 6, 2002, Mr. Sisco saw

psychologist Geral T. Blanchard, who concluded that Mr. Sisco suffered from Post Traumatic Stress Disorder ("PTSD") as a result of the alleged sexual harassment he had endured at Fab Tech.

Mr. Sisco filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on February 21, 2002, but Fab Tech did not become aware of the complaint until March 8, 2002, three days after Mr. Sisco's employment had been terminated.

## STANDARD OF REVIEW

■ Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. PRO. 56(c). "By its very terms, [the F.R.C.P. 56(c) ] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgement; the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The relevant inquiry is "whether it is so one-sided that one party must prevail as a matter of law." *Carey v. United States Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987). In considering the party's motion for summary judgement, the court must examine all evidence in the light most favorable to the non-moving party. *Barber v. General Elec. Co.,* 648 F.2d 1272, 1276 n. 1 (10th Cir.1981) (citing *U.S. v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). If after reviewing the evidence, "there is but one reasonable conclusion as to the verdict and reasonable minds would not differ as to the import of the evidence, summary judgment is appropriate." *Slavens v. Crossman,* 1989 WL 79068, *1 (D.Kan.1989) (citing *Anderson,*

477 U.S. at 250, 106 S.Ct. 2505). Applying this standard, the Court must determine whether the plaintiff made a sufficient showing on the essential elements of the case with respect to which the plaintiff has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## DISCUSSION

*Sexual harassment under Title VII*

This case involves an allegation of same-sex sexual harassment and claims of violations of Title VII of the Civil Rights Act of 1964. Title VII states, "It shall be an unlawful employment practice for an employer ... to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...." 42 U.S.C. § 2000e–2 (2004). The seminal case discussing same-sex sexual harassment is *Oncale v. Sundowner Offshore Services, Incorporated* in which the Supreme Court laid out the framework for evaluating whether a claim has been made for same-sex sexual harassment. 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Joseph Oncale worked for Sundowner Offshore Services, Inc. on an oil platform in the Gulf of Mexico in an all-male workplace. *Id.* at 77, 118 S.Ct. 998. While onsite, Oncale was harassed by several co-workers. *Id.* In the presence of the rest of the crew, Oncale was subjected to sex-related, humiliating actions. *Id.* Two of his co-workers physically assaulted Oncale in a sexual manner, and he was even threatened with rape. *Id.* Justice Scalia, writing for a unanimous Court, held that "nothing in Title VII necessarily bars a claim of discrimination 'because of ... sex' merely because the plaintiff and the defendant ... are of the same sex." *Id.* at 79, 118 S.Ct. 998. The Court, finding that

same-sex sexual harassment was actionable under Title VII, remanded for a determination of whether such harassment occurred "because of sex." *Id.* at 82, 118 S.Ct. 998.

■ In order to determine whether allegations are sufficient to support a claim for same-sex discrimination, Justice Scalia first noted that "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discrimination* ... because of ... sex.'" *Id.* at 80, 118 S.Ct. 998. "The critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring)). The Court laid out three ways in which a plaintiff in a same-sex sexual harassment case could demonstrate that the harassment was "*because of sex*": (1) evidence that the harasser is homosexual and the harassment is motivated by sexual desire; (2) evidence that the harasser is motivated by a hostility to the presence of the victim's gender in the workplace; or (3) evidence that the harasser treated males and females differently in a mixed-gender workplace. *Id.*; *Budenz v. Sprint Spectrum, L.P.*, 230 F.Supp.2d 1261, 1273 (D.Kan. 2002). "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination *because of sex*." *Oncale*, 523 U.S. at 81, 118 S.Ct. 998 (emphasis added).

■ Even if the Court finds that one of the three methods of proof of same-sex sexual harassment has been demonstrated, the Court must also find that the behavior at issue is "so objectively offensive

as to alter the 'conditions' of the victim's employment." *Id.* "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.* (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367). In evaluating the severity of the conduct, the Court should keep in mind that "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Id.* (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367). A judge is to use "common sense, and an appropriate sensitivity to social context" to distinguish between "simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Id.* at 82, 118 S.Ct. 998.

Defendants argue that the evidence does not support a claim for same-sex sexual harassment.[1] First, defendants assert that there is no evidence that Greg Andress, the supervisor accused of harassment, is homosexual or that he desired Mr. Sisco sexually. Second, there is no evidence that Mr. Andress was motivated by hostility toward men in the workplace. In fact, Mr. Andress states in his affidavit in support of the motion that he has worked most of his life in all-male workplaces similar to the one in issue and he has never held animosity toward males in his line of work. Finally, defendants claim that the workplace at Fab Tech was all-male, and there can be no evidence that Mr. Andress treated males and females differently in a mixed-gender workplace.

Plaintiff asserts that Mr. Andress harbored hostility toward men in the workplace and also treated males and females differently in the workplace. However, Plaintiff goes on to claim that Mr. Andress' conduct toward Mr. Sisco was worse than toward other males in the workplace. This declaration defeats any argument that Mr. Andress had general feelings of hostility toward males in the workplace or treated males, as a group, differently than females. In addition, there is no evidence in the record that Mr. Andress is homosexual. Mr. Sisco's supposition, based on one comment about Mr. Andress' wife's hysterectomy, is not sufficient to create a genuine issue of fact. In short, Plaintiff does not really contest the fact that he cannot show that any of the three situations described in *Oncale* existed in this case. Instead, Plaintiff relies primarily on a theory of sexual stereotyping. The Supreme Court has found that discrimination based on sexual stereotyping is discrimination "because of sex." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In the same-sex sexual harassment context, the Tenth Circuit recently stated in an unpublished opinion that there is "nothing in the Supreme Court's decision in *Oncale* indicating that the examples it provided were meant to be exhaustive rather than instructive." *James v. Platte River Steel Company, Inc.,* 113 Fed.Appx. 864, 867–68, 2004 WL 2378778, *3 (10th Cir.2004) (unpublished) (quoting *Shepherd v. Slater Steels Corp.,* 168 F.3d 998, 1009 (7th Cir.1999)). The Tenth Circuit cited as an example the Third and Ninth Circuits' holdings that "a

---

1. As a preliminary matter, Defendants assert that the Title VII claims against the individual defendants must be dismissed. Title VII, as a matter of law, does not provide for personal liability against persons in their individual capacities. *Haynes v. Williams,* 88 F.3d 898, 901 (10th Cir.1996). The case law supports Defendants' position, and no Title VII claim can lie against the individual defendants.

plaintiff may establish actionable same-sex sexual harassment by showing that the harasser's conduct was motivated by a belief that the plaintiff did not conform to the stereotypes of his or her gender." *Id.* (citing *Bibby v. Philadelphia Coca Cola Bottling Co.,* 260 F.3d 257, 262–63 (3d Cir.2001); *Nichols v. Azteca Rest. Enters., Inc.,* 256 F.3d 864, 869, 874–75 (9th Cir. 2001)). Mr. Sisco alleges that Mr. Andress directed the brunt of the harassment toward him because, as an effeminate man, Mr. Sisco did not fit the stereotype of an oil field worker.

■ The Court is cognizant in this situation that the Tenth Circuit has yet to formally endorse the same-sex sexual stereotyping theory in a published opinion as forming a basis for a finding of discrimination "because of sex." Even accepting this theory as a valid one in the Tenth Circuit, the Court concludes that Mr. Sisco has not brought forth evidence sufficient to create a genuine issue of material fact on sexual stereotyping. In support of his theory of same-sex sexual stereotyping, Mr. Sisco offers the affidavits of several co-workers. Loren Berg, the lead man in the upper shop, states that "[Mr. Andress] only picked on those that wouldn't defend themselves or those that he saw as weak and who didn't fit his image of what an oilfield worker should be." Berg Aff., ¶ 5. The affidavit of Ms. Rhonda Rice is similar, claiming that Mr. Andress had a "perception of a tough guy oilfield worker" that Mr. Andress did not believe Mr. Sisco lived up to. Rice Aff., ¶ 8. Any speculation as to Mr. Andress' motivation for targeting Mr. Sisco is pure conjecture on the part of Mr. Berg and Ms. Rice. It would be inadmissible at trial, and cannot be considered by the Court. FED. R. CIV. PRO. 56(e). The Court also notes that there is a difference between singling out a person because he does not fit the stereotype of the

typical male, and singling out a person because he does not fit the stereotype of the typical oilfield worker. Title VII does not, nor could it, protect those in every walk of life from the animus of others when they do not fit the stereotype of the particular role they are obligated to fulfill.

Some of Mr. Sisco's co-workers describe him as "laid back," Carl Aff., ¶ 6, "soft spoken," Berg Aff., ¶ 6, and even "effeminate because he was soft-spoken," Berg Aff., ¶ 11. On the other hand, the affidavits submitted by the Plaintiff also indicate that he "fit just fine." Rice Aff., ¶ 8. Mr. Sisco's own psychologist stated in his report that Mr. Sisco is "quite competitive and may feel the need to be, or appear, macho. He may overemphasize the masculine role and feel the need to dominate women." Blanchard Depo., Ex. 5, at 2. In an affidavit given by Gene Carl on behalf of the Plaintiff, Mr. Carl observed that "[Mr. Andress] was hostile to all the male employees." Carl Aff., ¶ 4. This seems to contradict the position that Mr. Sisco was singled out based on sexual stereotyping. Perhaps what is most telling, however, is the fact that nowhere in Mr. Sisco's deposition does he posit that Mr. Andress harassed him based on a sexual stereotype and when Ms. Rice spoke to Mr. Sisco about his situation, he told her he was being isolated, "and he didn't particularly know why." Rice Aff., ¶ 14.

This Court finds that the conduct described by Mr. Sisco is more than boorish—it is bestial. Though the work environment at Fab Tech may have been "rough and ready," the fact that one labors as part of a blue-collar industrial workforce in no way justifies the conduct attributed to Mr. Andress. No person, regardless of where he or she is employed, should have to endure such inexcusable conduct. Nevertheless, Mr. Sisco has not shown to this Court that Mr. Andress' alleged con-

duct was "because of sex." *Oncale,* 523 U.S. at 81, 118 S.Ct. 998. Mr. Sisco has not presented sufficient admissible evidence to demonstrate a genuine issue of material fact and much of the evidence submitted directly contradicts a sexual stereotyping theory. Summary judgment is granted for the Defendants on the Title VII sexual harassment claim.

### Retaliation in Violation of Title VII

Title VII prohibits retaliation against an employee who has engaged in an activity protected under Title VII. 42 U.S.C. § 2000e–3. If there is no direct evidence of retaliation, the Court should consider a retaliation claim under the *McDonnell Douglas* burden-shifting framework. *Stover v. Martinez,* 382 F.3d 1064, 1070 (10th Cir.2004) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Jeffries v. State of Kansas,* 147 F.3d 1220, 1231 (10th Cir.1998)).

> Following this framework, an employee must first present a prima facie case of retaliation, which then shifts the burden to the employer to produce a legitimate, non-discriminatory justification for taking the disputed employment action. *Jones v. Barnhart,* 349 F.3d 1260, 1266 (10th Cir.2003). If the employer provides a legitimate, non-discriminatory justification for the action, the burden shifts back to the employee to provide evidence showing that the employer's proffered reason is a pretext for discrimination. *Id.* An employee may demonstrate pretext by showing the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief. *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1120 (10th Cir. 2001).

*Id.* at 1070–71.

■ The first prong of the *McDonnell Douglas* framework is to determine whether Plaintiff has made out a prima facie case. The elements of a retaliation claim are: (1) that the plaintiff engaged in protected opposition to discrimination; (2) that the defendants took an adverse employment action against him; and (3) that there is a causal connection between the protected activity and the adverse employment action. *Id.* at 1071. Defendants concede that there may be an issue of fact as to the first element, whether Mr. Sisco engaged in protected opposition to discrimination, because he did file a complaint with the EEOC based on the alleged conduct at Fab Tech. The second element requires that there be some adverse employment action. The Tenth Circuit has said that "[a]lthough we will liberally construe the phrase adverse employment action, the action must amount to 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or ... causing a significant change in benefits.'" *Id.* (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). The only action that was taken by Fab Tech that meets the standard for "adverse employment action" is Mr. Sisco's termination on March 6, 2002. The final element is that there is a causal connection between the protected activity and the adverse employment action. Mr. Sisco claims that he told Mr. Rubis that he would file a complaint regarding the alleged harassment early in 2002. On February 21, 2002, he actually filed a claim with the EEOC. The complaint was formalized on March 1, 2002. Mr. Sisco asserts that he was fired for filing his complaint and has made out a prima facie case of retaliation.

Under the second prong of the *McDonnell Douglas* burden-shifting test, the Court must determine whether the em-

ployer has stated a legitimate, non-discriminatory justification for the action. *Id.* Defendants argue here that Mr. Sisco was terminated due to a slow down in work, as evidenced by the reduction in jobs on the job sheet and the reduced overtime hours of all employees. The affidavits and supporting evidence provided by Fab Tech confirm this justification.

The burden now shifts back to the Plaintiff "to provide evidence showing that the employer's proffered reason is a pretext for discrimination." *Id.* Mr. Sisco has submitted the affidavit of Ms. Rice, who states,

> Once the Charge of Discrimination was received, I was told to take jobs off the jobs list that were lined up, but hadn't started yet or those we weren't quite done with. This was done to make it look like we didn't have work. Jobs that were on the list one day were then gone the next. Most of our work came from Burlington Railroad. [Mr. Rubis] wanted to make the company's income and condition of the company look worse than it was, so that the firing of Sisco would look legitimate. I would walk into a room in the office and completely stop conversations. The Jobs Sheets went back to normal when the last agency stopped coming by.

Rice Aff., ¶ 18. However, the only factual basis for Ms. Rice's belief that the jobs were taken off in an attempt to justify Mr. Sisco's termination is the fact that conversations ceased when she entered a room. Any supposition as to why those conversations ceased is pure conjecture, not based on the personal knowledge of Ms. Rice, and cannot be considered by the Court.

Defendants have offered the affidavits of Mr. Rubis and Judy Barton, supervisor of Ms. Rice, which state that jobs were taken off the job list, in response to Burlington Railroad's postponement of two major jobs. The job sheets support this explanation. Mr. Sisco has failed to show that Fab Tech's "proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Stover*, 382 F.3d at 1071. In fact, the evidence supports Fab Tech's justification. Summary judgment is granted for Defendants on the Title VII retaliation claim.

*Intentional Infliction of Emotional Distress* [2]

The elements of an intentional infliction of emotional distress claim in Wyoming are: (1) that the defendant intentionally or recklessly; (2) participated in extreme and outrageous conduct; (3) which caused the plaintiff; (4) severe emotional distress. *Larsen v. Banner Health System*, 81 P.3d 196, 205 (Wyo.2003). Defendants first argue that the claim is barred by worker's compensation. Second, defendants assert that the conduct of Mr. Rubis was not in any sense "extreme and outrageous" and the claim against him should be dismissed. Third, defendants claim that the conduct of Mr. Andress was not "extreme and outrageous," and that even if it was, Mr. Sisco has not suffered from severe emotional distress.

Worker's compensation does not bar the intentional infliction of emotional distress claim in this case. In Wyoming, worker's compensation is the exclusive remedy to an employee injured in the course and scope of employment. Wyo. Stat. Ann. § 27–14–104(a) (LexisNexis 2004). An employee cannot file a lawsuit against an employer for an injury incurred during employment. However, "injury"

2. The Court has granted summary judgment on the federal claims involved in this case, but under its discretion, chooses to retain jurisdiction of the pendant state law claims.

does not include "[a]ny mental injury unless it is caused by a compensable physical injury, it occurs subsequent to or simultaneously with, the physical injury and it is established by clear and convincing evidence ...." *Id.* § 27–14–102(a)(xi)(J). The emotional distress of which Mr. Sisco complains was not caused by a physical injury, but by the alleged harassment he endured from Mr. Andress. Defendants argue that *Anderson v. Solvay Minerals, Inc.* supports their contention that intentional infliction of emotional distress claims are barred by worker's compensation in Wyoming. 3 P.3d 236 (Wyo.2000). In *Anderson,* the family of a miner killed in a mining accident filed suit for intentional infliction of emotional distress. *Id.* at 237. The Wyoming Supreme Court held that "under these circumstances," *id.* at 239, the intentional infliction of emotional distress claim was derivative of the miner's death, and therefore, subsumed by the worker's compensation statutes. *Id.* at 242. In this case, the mental injury is not derivative of any physical injury, and not barred by worker's compensation.

■ Mr. Sisco has brought forth enough evidence to create a genuine issue of material fact on the intentional infliction of emotional distress claim as to Mr. Andress, but not as to Mr. Rubis. When the facts are viewed in the light most favorable to Mr. Sisco, it could be said that Mr. Andress' conduct was both intentional and extreme and outrageous. No person, regardless of whether he works in an office building or in an industrial fabrication shop should be subjected to the kind of behavior Mr. Sisco attributes to Mr. Andress. Mr. Sisco has also presented enough evidence to show he suffered from severe emotional distress. According to Mr. Sisco, he lost 30 pounds, could not sleep, was nauseated, and vomited regularly. Mr. Blanchard, Plaintiff's psychologist,

diagnosed Mr. Sisco with PTSD after the experience. Genuine issues of material fact exist, and summary judgment is denied on this claim as to Mr. Andress.

■ The conduct of Mr. Rubis, on the other hand, was not extreme and outrageous. When told of the name-calling in September of 2001, Mr. Rubis called a meeting and asked that the behavior stop. Mr. Sisco has alleged that when Mr. Andress' conduct escalated later that year and into the new year, he spoke with Mr. Rubis again regarding his discomfort and concerns. Initially, Mr. Rubis said he would get it under control. There is no evidence in the record before the Court to suggest that Mr. Rubis did not try to handle it. There is only Mr. Sisco's averment that at their final meeting, Mr. Rubis told Mr. Sisco that if one of the two of them (Mr. Sisco or Mr. Andress) had to go, it would be Mr. Sisco. This conduct does not meet the high standard for extreme and outrageous conduct. *Leithead v. American Colloid Co.,* 721 P.2d 1059, 1066 (Wyo.1986) ("Extreme and outrageous conduct" is defined "as conduct which goes beyond all possible bounds of decency, is regarded as atrocious, and is utterly intolerable in a civilized community."). Summary judgment is granted on the intentional infliction of emotional distress claim against Mr. Rubis.

*Intentional Acts Causing Injury*

■ In Wyoming, an employee can maintain a tort action against a co-employee, and is not barred by worker's compensation, if "the evidence demonstrated the co-employee had knowledge of the dangerous condition and demonstrated a disregard of the risks through intentional acts." *Bertagnolli v. Louderback,* 67 P.3d 627, 634 (Wyo.2003). In this case, when the facts are taken in the light most favorable to Mr. Sisco, a genuine issue of material

fact exists. Mr. Andress knew of the harm that could be caused by requiring Mr. Sisco to perform prolonged sandblasting, as he was present during Mr. Sisco's conversation with Mr. Rubis on his first day of work, when Mr. Sisco described his limitations. Despite this knowledge, Mr. Sisco was required to sandblast at the behest of Mr. Andress. On one occasion, Mr. Sisco had two teeth knocked out, one tooth broken, and sand embedded in his eye while sandblasting alone. A plate that had been put in Mr. Sisco's arm after a prior injury came loose as a result of the sandblasting. Mr. Sisco has demonstrated a genuine issue of material fact and summary judgment is not appropriate on this intentional tort claim.

*Negligent Supervision*

■ The tort of negligent supervision has never been expressly recognized and the elements set forth in Wyoming law. United States District Court Judge Johnson stated in *Glover v. TransCor America, Inc.* that it was his belief that the Wyoming Supreme Court would adopt the definition of the cause of action in Restatement (Second) of Agency § 213 if given the chance. 57 F.Supp.2d 1240, 1246 (D.Wyo.1999). This belief was based on the fact that the Wyoming Supreme Court has recognized the tort in several cases, although it has never had occasion to apply it or define its contours. *See Romero v. Schulze,* 974 P.2d 959, 964 (Wyo.1999); *Sharsmith v. Hill,* 764 P.2d 667, 673 (Wyo. 1988); *Cranston v. Weston County Weed and Pest,* 826 P.2d 251, 258 (Wyo.1992). This Court is persuaded by *Glover* that a cause of action for negligent supervision exists in Wyoming as defined by Restatement (Second) of Agency § 213. As such, summary judgment is denied on the negligent supervision claim.

THEREFORE, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.